# THE SUPREME COURT

OF

# OREGON.

## MARCH TERM, 1887.

[Filed March 7, 1887.]

## S. BROWN AND N. GOODMAN *v.* S. T. NORTHCUTT.

WAREHOUSE.—RIGHTS OF DEPOSITORS.—Where several depositors have wheat stored in a warehouse in a common mass, and a deficiency occurs, from whatever cause, not occasioned by the fault of any such depositors, the loss must be borne by each of them in the proportion which the amount of his wheat bears to the whole amount deposited.

SAME—CONTRIBUTION.—In such case, where a depositor has received the full quantity of the wheat deposited by him, or a larger proportion than his rateable share, in view of such deficiency, he is bound to account to the other depositors for such excess, according to the proportion of the loss.

SAME.—But it seems a depositor will not be liable so to account, unless such loss occurred after he so stored his wheat. The loss must be borne by those who were depositors at the time it occurred.

MARION COUNTY. Defendant appeals. Affirmed.

*N. B. Knight* and *J. A. Stratton*, for Appellant.

The bill of sale from Harkleroad describes only the wheat in the warehouse, and is conclusive against the respondents unless they can vary its terms by parol, and this they cannot

XIV. OREG.—34.

do. (*Van Evra* v. *Davis*, 51 Iowa, 641; *Hutton* v. *Arnett*, 51 Ill. 198 ; *Partridge* v. *White*, 59 Me. 564 ; *Ridgway* v. *Bow-man*, 7 Cush. 271.)   This is not the case of an agreement containing ambiguous provisions which the parties seek to explain by parol, as are all the cases cited by respondents; the words of the agreement are clear and explicit, and plaintiffs seek by parol to give the agreement a meaning utterly at variance with the natural import of the language used. (*Millett* v. *Marston*, 62 Me. 477.)   When Harkleroad, on Northcutt's order, separated his grain from the mass in store, the latter became the owner thereof in severalty.   And when it was placed in the cars the railway company became the bailee.   (Angell on Carriers, Secs. 129, 130, 131; *Judson* v. *Western R. R. Co.*, 4 Allen, 520 ; *Fitchburg & Worcester R. R. Co.* v. *Hanna*, 6 Gray, 541; *Illinois &c. R. R. Co.* v. *Smyser*, 38 Ill. 354 ; *Sexton* v. *Graham*, 53 Iowa, 181 ; *Squires* v. *Payne*, 6 Cal. 654 ; *Clark* v. *Griffith*, 24 N. Y. 595 ; *Hubler* v. *Gaston & Furry*, 9 Or. 67–9 ; *Williams* v. *McGrade*, 13 Minn. 174 ; *Moher* v. *Stoner*, 14 Iowa, 115.)

*William M. Ramsey*, for Respondents.

It is competent to show, by parol, what property the parties contracting intended should pass by a bill of sale. (*Morrow* v. *Reed et als.*, 30 Wis. Rep. 81; *Galen et al.* v. *Brown*, 22 N. Y. R. 37 ; *Rugg et al.* v. *Hale*, 40 Vermont R. 133 ; *Dodge* v. *Potter et al.*, 18 Barbour R. 193.)   Where grain of different owners has been intermingled in common by a warehouseman without objection and according to usage, it becomes common property, owned by the several parties in the proportion in which each had contributed to the common mass.   The several owners are subject to sustain any loss, *pro rata*, which may occur by diminution, decay or otherwise. (*Dole* v. *Olmstead et al.*, 36 Ill. 150; *Sexton* v. *Graham*, 53 Iowa, 181, 192; *Dows* v. *Eckstrone*,.1 McCrary Rep. 434.)   And where the. warehouseman assigns, as in this case, and there is a deficiency, and any depositor has received more than his rateable share, he

is compelled to account for such excess received by him, according to his proportion of the loss.  (*Dole* v. *Olmstead, supra,* 150, 154; *Greenleaf* v. *Dows et al.,* 3 McCrary, 27.)

THAYER, J.—The main facts of this case are as follows: In January, 1880, certain parties, including the respondents and the appellant, had wheat in different amounts on storage in the warehouse kept by one S. Harkleroad, at Gervais, in Marion County.  The wheat had been received by Harkleroad as warehouseman, and was in mass.  On the 22d of January, 1880, the appellant having made arrangements with Allen & Lewis of Portland, to sell to them the wheat he had on deposit in said warehouse, gave an order to Harkleroad to ship it to said Allen & Lewis, and at the same time contracted with Harkleroad to procure for him the necessary sacks in which to place it for shipment.  Harkleroad engaged transportation of the railroad company for the wheat.  There was a side track to his warehouse, and the company left some cars upon it to receive the wheat.  Harkleroad engaged in sacking and putting the wheat aboard these cars.  After he had sacked up some thirteen hundred and thirty-three bushels, the greater part of which he had put aboard the said cars, he stopped sacking and sent for appellant, who lived a few miles out in the country from Gervais.  Appellant came to Gervais on the evening of the 30th of said month of January, and was then informed that there was not sufficient wheat on storage in said warehouse to pay all the depositors the amounts they had respectively stored with Harkleroad.  A conference was had between Harkleroad and the respondents and appellant, which resulted in Harkleroad's making a bill of sale to them of certain effects, including the wheat; and on the following day they, respondents and appellant, entered into a written agreement between themselves, of which the following is a copy: " Articles of agreement made and entered into by and between N. Goodman, S. T. Northcutt and S. Brown, of Marion County, State of Oregon, on this 31st day of January, 1880, as follows, to wit: Whereas S. Harkleroad did on the 30th day of January, 1880, make a bill of sale *and deliver*

to the above named parties to this agreement all his personal
property, consisting in part of wheat in the warehouse at Gervais
and all other articles mentioned in said bill of sale, for the pur-
pose of said parties converting the same into money, and pay-
ing themselves *pro rata* for the claims the said parties hold
against said Harkleroad, on account of having wheat stored in
his (Harkleroad's) warehouse in Gervais ; each one of said
parties' claim is as follows, to wit: J. Stevens per S. Brown,
seven hundred and two and thirty-one sixtieths bushels ; S. T.
Northcutt, seventeen hundred and twenty-three and twenty-
three sixtieths bushels ; N. Goodman, seven hundred and eighty-
eight bushels ; W. McKee, per S. Brown, ten and forty-nine
sixtieths bushels; and further agree that as soon as the wheat
above referred to is converted into money or divided, then the
fund arising from said wheat, as well as that of any other prop-
erty so sold by us, shall be divided *pro rata*, as each claim bears
to the whole amount claimed.    And we further agree to con-
vert all said property, real and personal, into money; then a
full and equal division *pro rata* to be made, and all business
to be settled up as soon as the nature of the business will ad-
mit of, with as little loss to us as possible ; and it is further
understood that the shriveled or spring wheat in said ware-
house, turned over to us by said Harkleroad, does not belong
to the parties to this agreement, only such as is left, if any,
after the parties who own the same have taken out their claims
on said wheat.              " Witness, etc.,

                                    "N. GOODMAN.
                                    " S. T. NORTHCUTT.
                                    " S. BROWN."

The respondents and appellant were the principal owners of
the wheat stored.    There were, however, three parties besides
those named in said written agreement, who also had wheat
stored with Harkleroad, viz: John Wolford & Co., 117.60
bushels, James Broyles, 28 bushels, and Charles Barkhurst,
166.30 bushels, subject to the general deficiency.    The follow-
ing is a copy of the bill of sale referred to in said agreement
above set out, viz:

"Know all men by these presents, that I, Samuel Harkleroad, of Gervais, Marion County, State of Oregon, have this day sold to N. Goodman, S. T. Northcutt, and Samuel Brown, and delivered to them, all my right, title and interest in and to the following described property, to wit, for the consideration hereinafter named : All the wheat in the warehouse which the said Harkleroad has been controlling during the year 1879, and up to this date, known as the H. Hewett & Co. warehouse, in Gervais, and also all sacks in said warehouse, or due him from different parties ; also all book accounts and notes due said Harkleroad for storage, etc. ; 1 pair platform scales, 1 beam scale, 1 pair trucks, 1 scoop shovel and some belting, 1 bay horse named John, 1 sorrel mare named Nell, 1 Etna mower, some buckwheat screenings in said warehouse, 1 set double harness, 1 sulky plow, 1 Standard organ ; for the consideration of the sum of $3,500, the receipt of which is hereby acknowledged.

"Done in Gervais, Oregon, this 30th day of January, 1880.
"S. HARKLEROAD.     [L. S.]"

After said bill of sale was executed, and the understanding had in reference to the closing out of the affair, the appellant became solicitous about his arrangement with Allen & Lewis to sell them his wheat, which resulted in an agreement between him and the respondents, that he should have a sufficient part of it, at one dollar a bushel, to fill his contract with Allen & Lewis.

The business and assets of said Harkleroad were, on the said 31st day of January, delivered over to respondents and appellant. The latter says in his testimony, that "the next day, that is Saturday, the 31st, the key of the warehouse was given to me. I went over to the warehouse for a few minutes and came back to Mr. Goodman's." Then he went and received the property, went by the warehouse, told the men that had been working there for Harkleroad that he did not think he could do any work in the warehouse that day ; went up to Harkleroad's, and was busy until noon receiving the property ; thinks that was all that was done that day between Brown,

Goodman and himself; thinks the agreement was drawn up and signed that day, and the next morning, Sunday, got some hands and went to work. The first work was to sew some sacks that were filled when he went in, and load a car; did not fill any wheat to load the car out of the bins; there was a carload already filled; that appellant received of said wheat, including that which was at the time aboard the cars and that had been sacked and left in the warehouse, sixteen hundred and eighty-seven bushels, which he delivered to Allen & Lewis upon his contract with them, and received the price thereof.

There was a deficiency of wheat held by Harkleroad at the time appellant gave the order to ship his wheat to Allen & Lewis, and at the time Harkleroad began loading the cars, amounting to about one third the quantity that had been stored with him by the several parties before mentioned. The suit was brought to adjust the matter, and to compel the appellant to account for the 1687 bushels at one dollar a bushel, the price he had agreed to pay therefor, if the respondents would permit him to ship it upon his said contract; and I am not able to discover any sufficient reason why he should not be required to do so. It is true that the bill of sale and the written contract between the parties only specify the wheat in the warehouse; but it is evident, I think, that the parties intended them to include all the wheat Harkleroad had on hand, or that was in the cars, or that had been sacked. The written agreement shows that, and the testimony establishes it beyond any question.

It is claimed upon the part of the appellant that all the wheat that had been placed in the cars prior to the time of the agreement between the parties, and all that had been sacked and left in the warehouse, belonged of right to appellant; that as soon as it was segregated from the mass of wheat it became his in severalty; and that he did not know, at the time he signed the contract, that the thirteen hundred and thirty-three bushels had been sacked and the three cars loaded, and that he should therefore be entitled to claim that wheat, notwithstanding he had agreed to receive it and pay to respondents a dollar a bushel therefor.

If it were material, I do not think appellant could establish from the testimony, ignorance or want of knowledge of that fact. He had given the order to have his wheat shipped ; was at the warehouse on the morning of the day the contract was entered into; testified that three cars were then loaded ; went the next day and began the completion of the shipment of the wheat; and on the 2d day of February, thereafter, according to the testimony of Mr. W. T. Welch, book-keeper of the assignees—respondents and appellant—the amount of the wheat received by appellant and shipped to Allen & Lewis was charged up against appellant upon the books of the said assignees under the direction of the last named parties, and apparently with the full approval of all of them. He certainly had the fullest opportunity to ascertain before signing the said contract what had been done by Harkleroad in compliance with his order. But what does it signify, whether he knew it or not ? There was a shortage of wheat in the warehouse before any was taken out to put aboard of said cars. There was only about two-thirds enough to pay the depositors, including the appellant, the amounts they had respectively stored there; and the wheat not having been kept separate, the deficiency or loss, from whatever circumstance it may have occurred, if not occasioned by the fault of any of them, must fall upon all in the proportion which the amount of wheat each had deposited bore to the whole amount deposited. This rule is based upon a maxim that all courts are bound to observe—the maxim that equality is equity—and it certainly could have no better foundation. The authorities produced at the hearing by the respondents' counsel show that it has been recognized and approved by courts of the highest authority. (See *Cushing et al.* v. *Breed et al.*, 14 Allen, 380 ; 53 Iowa, 192, 193 ; 3 Federal Reporter, 19 and 20; *Dole et al.* v. *Olmstead et al.*, 36 Ill. 150.)

In *Cushing* v. *Breed, supra,* the court held that where several parties had stored various parcels of grain in an elevator, and it was put into one mass according to usage, to which they must have been deemed to have assented, they were tenants in common of the grain, and that each was entitled to

such a proportion as the quantity placed there by him bore to the whole mass; and in *Dole* v. *Olmstead, supra,* the court held the same doctrine, and held, further, that the grain being thus owned in common, the several owners were compelled to sustain any loss *pro rata* which might occur by diminution, decay, or otherwise; and that where the holder of a receipt had received the full quantity, or a larger proportion than his rateable share in view of the deficiency, he would be bound to account for such excess received by him according to his proportion of the loss.

This is undoubtedly the correct rule, as it is founded upon common justice. The result of the rule is simply this: A puts wheat in a warehouse for storage; B, C, and others, severally, have wheat there for the same purpose. It is all mingled together, with the presumed consent of all parties. They each necessarily own the several amounts of wheat they have there, but neither can identify his own, but it is in common; and if a loss occurs by casualty, or the warehouseman wrongfully abstracts a part of the general lot, it must necessarily be borne by the depositors *pro rata.* But to render A liable to contribute to the loss, it must occur after he stored his wheat; he would not be affected by any deficiency which occurred prior to his deposit of his wheat. Former deficiencies would have to be borne by B, C, and others, who had wheat there when it occurred. A's amount of wheat would be the proportion it bore to the whole amount actually in store when he placed his there, not to the amount it would be with what B, C and others *had really put there.*

Now, when the appellant gave the order to Harkleroad to ship his wheat to Allen & Lewis, he did not have on storage with him seventeen hundred and twenty-three and twenty-three-sixtieths bushels. Assuming that the deficiency amounted to one-third of the whole mass, he only had eleven hundred and forty-eight and a fraction bushels there, and had no right whatever to take more than that from the warehouse. Any attempt upon his part to take beyond that quantity was an attempt to take wheat which did not belong to him or to

Harkleroad, but which did belong to the respondents and the other depositors. The diminution of the general lot of wheat in the warehouse one-third has diminished his quantity one-third, also, and left him only the owner of the number of bushels before mentioned. His attempted shipment of his wheat, therefore, gave him no better standing or further rights in the premises than the other depositors enjoyed, although it were sacked and put aboard of the cars, except this: he might, when he came to Gervais on the said 30th day of January, have elected to take the eleven hundred and forty-eight bushels; but it was an advantage to him to accept the assignment, as he thereby also acquired an interest in the scales, horses, and other property included in the bill of sale from Harkleroad.

Some suggestion was made upon the argument, that the law favored the vigilant in obtaining their rights. To a certain extent that is correct. The law looks with disfavor upon a party who sleeps upon his rights, but it certainly does not commend the vigilance of a party in his endeavors to deprive others of their rights. The vigilance that is exercised to get others' property from them may be tortious and even criminal.

I cannot see but that the respondents and appellant acted fairly and manly in their attempted adjustment of the matter. The respondents may have been officious in having Harkleroad quit the shipment of the wheat for appellant; but they had a right to be ; their wheat was there also; a deficiency had occurred in the amount of wheat on hand. There was not enough left to pay all the depositors in full, and if the appellant were permitted to take out the full amount he had placed in the warehouse their loss would be greater. It was right, under the circumstances, that Harkleroad should desist from shipping the wheat until the affair could be arranged, and it could not have been arranged in any better or more honorable way than it was. The respondents and appellant being the principal depositors of wheat, all that remained on hand and all the other property Harkleroad had was assigned to them, and they entered into the written agreement to administer upon it. Even if the appellant had obtained a legal advantage

in consequence of a part of the wheat having been sacked and
delivered aboard the cars, it would have been the merest tech-
nical advantage imaginable, and would have operated inequit-
ably and unjustly. I think a court should, in any case, require
the clearest proof of fraud or imposition, before relieving a party
from his contract in order that he might profit by an unjust
advantage the law may afford. But as before stated, the ap-
pellant held no advantage on account of the segregation of the
wheat sacked from the mass. He had no right to accept or
remove a kernel of it beyond his *pro rata* portion, and that was
awarded to him in the adjustment by the terms of the written
agreement. The suit was brought to enforce that agreement,
and for a final accounting between the parties to it. The able
and experienced circuit judge has heard the case, and, I think,
has decided it correctly, in the main. There is a discrepancy
in the account against the appellant, arising out of charging
him the full amount of storage on the wheat in controversy.
This sum should have been deducted from the amount of ap-
pellant's wheat on storage, on which his dividend is declared.
The decree will therefore be modified accordingly, and in other
respects affirmed. Costs of appeal to be paid out of the funds
in the hands of assignees.

LORD, C. J.—This is a case of bailment. Upon that hy-
pothesis, where wheat of different owners has been deposited
in a warehouse, and so intermingled that identification of sep-
arate ownership is lost, the depositors of such wheat in mass
are tenants in common. | But the title of the depositors, or the
ownership of such wheat, has not been destroyed by the in-
termixture—the depositors have simply transferred the posses-
sion to the warehouseman, and he holds it as their agent, and
subject to their orders for a delivery of the possession. In
such case, the wheat is a common fund, out of which each de-
positor is to be restored to his possession; or, so to speak, for
the repayment of each owner's wheat. Any owner or depos-
itor, upon the payment of charges for storage, has a right to
demand the redelivery of his wheat, and to be restored to its

possession. The segregation of the wheat from the bulk, and the delivery of it to the owner for the quantity of wheat to which he is entitled, only puts him in possession of his own property. The effect of the segregation is to identify the wheat for the purpose of delivering possession of it to the owner. But the segregation of the wheat by which its identity is restored, to make it available for a delivery of possession to the owner, always proceeds upon the principle that the warehouseman is in possession of the wheat in mass of such depositors, and from which, by segegration, he identifies the wheat of an individual owner, and restores it to his possession. His act is but a partitioning of the individual quantity from the mass with which it has been intermingled, and must, of necessity, operate upon the mass of which such individual quantity constitutes a part. But being a part of such mass, whatever affects or diminishes that mass will affect or diminish proportionally all the parts of such mass, and consequently such individual part, or depositor's quantity of such mass. When, therefore, by reason of accident or other cause, there has been a loss or diminution of the mass, it affects rateably the quantities to which such depositor is entitled of such mass, reduces the gross quantity of the wheat in the possession of the warehouseman, and proportionally limits his power of restoring possession to them. His possession of the wheat in mass being for the depositors, is affected in the same degree as their ownership is by the loss or diminution. His possession is still of a mass, but of a diminished mass, and they are tenants in common of such diminished mass. His power to restore possession is measured by the quantity to which each depositor is entitled of such diminished mass. And this is the ground of division, whether the warehouseman is in possession, or the depositors have taken possession of such mass. The warehouseman cannot rightfully give, nor can any depositor rightfully take, possession of any greater quantity than he is entitled to, based upon the mass affected by the loss or diminution.[1] If the warehouseman should deliver to any depositor a greater quantity than he would be entitled to from such residue, although the proper quantity to which he would have

been entitled if there had been no loss or diminution, it would be a wrongful taking as well as a wrongful possession as against the other depositors, for the surplus over the quantity to which he would have a right of such residue.[1] Analagous to the principle upon which equity acts, where several parties are entitled to participate in a common fund, and awards a distribution upon the maxim that "equality is equity," it will treat such residue as a common fund, to be distributed in rateable proportions among the depositors entitled to participate in it. Upon this principle, as disclosed by the record, the decree can be sustained. So far as appears, all who have a right to participate in the distribution have been made parties. In such case, the remedy in equity is more complete, and certainly would avoid a multiplicity of suits. It acts upon the collective rights and liabilities of the parties, which is said to be a distinguishing feature of the equity system, and awards its distribution upon the equitable principles of the maxim cited.