**UNITED STATES of America, Appellant,**

**v.**

**Frank LUTHER, Trustee of the Garden Grain & Seed Co., Inc., Appellee.**

**Frank LUTHER, Trustee of the Garden Grain & Seed Co., Inc., Cross-Appellant,**

v.

**UNITED STATES of America, Cross-Appellee.**

**In the Matter of GARDEN GRAIN AND SEED CO., Inc., Bankrupt (two cases).**

**Nos. 4928, 4929.**

United States Court of Appeals Tenth Circuit.

July 5, 1955.

Rehearing Denied in No. 4928 July 27, 1955.

See also 225 F.2d 495.

John G. Laughlin, Atty., Dept. of Justice, Washington, D. C. (Warren E. Burger, Asst. Atty. Gen., William C. Farmer, U. S. Atty., Wichita, Kan., and Melvin Richter, Atty., Dept. of Justice, Washington, D. C., on the briefs), for appellant and cross-appellee.

Malcolm Miller, Wichita, Kan., for appellee and cross-appellant.

Before PHILLIPS, Chief Judge, and BRATTON, HUXMAN, MURRAH and PICKETT, Circuit Judges.

PHILLIPS, Chief Judge.

Garden Grain and Seed Co., Inc.[1] doing business under the corporate and warehouse laws of the State of Kansas, operated grain warehouses at Garden City, Ingalls, and Pierceville, Kansas. On January 16, 1952, the Grain Company was adjudged an involuntary bankrupt. A trustee in bankruptcy was appointed and, in addition to the general assets of the Grain Company, took possession of 490,560 pounds of wheat and 4,320,900 pounds of milo, which the Grain Company held in storage for the Commodity Credit Corporation[2] and others at the inception of the bankruptcy.

On August 15, 1952, the United States, in behalf of its wholly owned corporate instrumentality, Commodity filed its proof of claim in the bankruptcy proceeding.

This is an appeal from an order of the referee in all respects confirmed by the district court on a petition for review, allowing in part and disallowing in part such claim. In its claim the

1. Hereinafter called the Grain Company.

2. Hereinafter called Commodity.

United States alleged, inter alia, that the Grain Company was indebted to it in the aggregate amount of $148,059.89; that 207,696.12 cwt. of milo and 20,941.71 bushels of wheat had been stored with the Grain Company, pursuant to Uniform Grain Storage Agreements, executed on June 9, 1949, and July 1, 1950; that Commodity either held warehouse receipts for such grain at the inception of bankruptcy or had surrendered warehouse receipts for such grain without obtaining delivery prior to bankruptcy; that during the period from October 17, 1950, to May 23, 1951, Commodity surrendered warehouse receipts and issued loading orders to the Grain Company requiring it to load out and deliver 187,207.16 cwt. of milo; that no shipping orders were issued by Commodity to the Grain Company for the remaining 20,488.96 cwt. of milo nor for the 20,941.71 bushels of wheat and that Commodity still owns warehouse receipts from the Grain Company for such milo and wheat; that the market value of such undelivered milo was $52,554.18 and the market value of such undelivered wheat was $49,317.73; that Commodity is the owner of 10,811.06 cwt. of milo which the Grain Company failed to deliver pursuant to shipping orders and of 20,488.96 cwt. of milo and 20,941.71 bushels of wheat for which no shipping orders were issued by Commodity to the Grain Company, and that if the Grain Company or the trustee has sold or otherwise disposed of such milo and wheat and is unable to deliver possession thereof to Commodity, then the proceeds of such milo and wheat are the property of and should be paid to Commodity.

By the terms of a Storage Guarantee Agreement, entered into on April 3, 1950, the Grain Company agreed to construct a new elevator at Pierceville, Kansas, and to reserve 75 per cent of its capacity for grain tendered for storage by Commodity or by farmers for storage for their account, and Commodity agreed that if the average occupancy of the facility for any reason should be less than 75 per cent of the storage capacity, Commodity would pay the additional charges specified in Paragraph 8 of the Agreement. The Pierceville elevator was completed and ready for occupancy on October 30, 1950. In December, 1951, the Grain Company filed a corrected voucher of $8,094.29 for charges under such Paragraph 8 for the year commencing October 30, 1950, and ending October 31, 1951. Seventy-five per cent of the claim, or $6,070.72, was provisionally paid on December 18, 1951.

In its proof of claim the Government sought to recover the amount of the provisional payment on the ground that the Grain Company had violated the terms of the Uniform Grain Storage Agreements and the Storage Guarantee Agreement.

The balance of the Government's claim of $148,059.89 is made up of storage overcharges, quality deficiencies on grain delivered, and other items which are not now in dispute.

The trustee sold the 490,560 pounds of wheat and 4,320,900 pounds of milo, which the Grain Company had in storage at the inception of bankruptcy. He received $18,271.25 for such wheat and $103,995.25 for such milo, and now holds the proceeds of such sales for ultimate disposition to storage claimants. The funds are referred to as the Milo Fund and the Wheat Fund.

The trustee filed interpleaders in the bankruptcy proceeding in which he set up that he had in his possession $103,995.25, proceeds of the sale of milo which came into his possession; that there should be added to such Milo Fund $11,961.19 received from milo in transit at the time bankruptcy ensued and $228,521.56, the value of 9,642,260 pounds of milo which the trustee was seeking to recover from Commodity; that there had been filed with the trustee numerous claims by individuals who alleged that they held warehouse receipts for milo and numerous claims by individuals who alleged that they had placed milo with the Grain Company on open storage.

He further set up that he had in his possession $18,271.25, the proceeds of the sale of wheat which came into his possession, and that numerous claims for wheat had been filed by parties alleging that they had stored wheat with the Grain Company which had not been delivered to them.

He further set up the filing of the claim of Commodity.

The trustee asked that various claimants, including Commodity, be interpleaded, and that their respective rights in the Milo and Wheat Funds be adjudicated.

The trustee also filed what he captioned "Action To Recover The Value of 9,642,260 lbs. of Yellow Milo Obtained By Commodity Credit Corporation From Bankruptcy Within Four Months of Bankruptcy, Which Constitutes A Preference." In that pleading the trustee alleged that Commodity had issued loading orders for milo and had surrendered warehouse receipts to the Grain Company at the time the loading orders were issued; that before shipments were made pursuant to the loading orders, Commodity learned of grain shortages in the storage facilities of the Grain Company and caused an audit to be made of the Grain Company's books and records on October 7, 1951, which audit was completed, written and delivered to Commodity on October 18, 1951; that on October 7, 1951, Commodity knew that the Grain Company was 88 per cent short in its storage obligations; that Commodity induced the Grain Company to give preference to shipments to Commodity, knowing that "the bankrupt did not have for its account, nor did the bankrupt own, the grain so shipped and that the grain shipped was not stored grain," and that pursuant to such inducement the Grain Company shipped 9,642,260 pounds of milo to Commodity within the four-month period preceding bankruptcy; that such shipments were made when the Grain Company was, in fact, bankrupt and resulted in Commodity obtaining a greater percentage of its indebtedness than other creditors of

the same class; that such shipments were made at a time when Commodity knew the Grain Company was bankrupt and that the grain shipped did not belong to Commodity.

The trustee prayed that Commodity be required to restore such milo or the value thereof, in the amount of $228,521.26.

In the action to recover, the trustee also sought recovery of the unpaid balance of the corrected voucher, in the sum of $2,023.57.

The United States moved to dismiss the so-called action to recover on the ground that the court lacked jurisdiction of the controversy and that the United States had not consented to the adjudication of the alleged preference in a summary proceeding. The motion was denied by the referee. Such asserted defenses were again raised in the Government's answer to the action to recover.

Early in September, 1951, a Kansas warehouse examiner, having statutory authority so to do, began an examination of the Grain Company's storage accounts. He found the records of the Grain Company were improperly kept and that there was a shortage of 132,235 bushels of milo in its storage account. About the same time an auditor of Commodity began an examination of the Grain Company's storage accounts and found it was short in its milo storage account more than 10,713,060 pounds and that the state examiner had failed to uncover that shortage. Subsequent to September 30, 1951, and after it had full knowledge of such shortages of the Grain Company's storage accounts, Commodity obtained from the Grain Company on loading orders 9,426,780 pounds of milo. No other storer of milo with the Grain Company withdrew any milo after September 30, 1951. In a written report made by Commodity's auditor on October 18, 1951, it was stated that the Grain Company was 88 per cent short in its storage liability.

The referee made findings of fact and filed a memorandum opinion and concluded that Commodity's claim should

be allowed to the extent of $103,594.36. The referee found that Commodity was entitled to 3,130,002 pounds of milo and 769,802 pounds, or 12,830.03 bushels, of wheat.

The referee denied the right of the United States to recover the provisional payment and found that it was obligated under the Storage Guarantee Agreement to pay the trustee a balance of $12,829.28, after crediting Commodity with the provisional payment. The referee disallowed the claim of preference, but held that equity and good conscience required that Commodity be charged with the milo obtained by Commodity from the Grain Company after September 30, 1951, in the amount of 9,426,780 pounds, or the value thereof. As a result, the referee found that Commodity's pro rata interest in the Milo Fund was 941,212 pounds, of the value of $22,611.51.

The referee found that the pro rata interest of Commodity in the Wheat Fund was 258,280 pounds, of the value of $9,619.81.

The referee further found that to the extent Commodity's grain claims were not satisfied from the Wheat and Milo Funds, they were valid claims against the estate. Accordingly, the referee concluded that the unsatisfied grain claims totaled $51,874.32 for 2,188,790 pounds of milo and $19,011.49 for 511,522 pounds of wheat. Of these amounts 142,919 pounds of milo and 342,615 pounds of wheat were represented by warehouse receipts acquired by Commodity after bankruptcy. The referee held that the value of such receipts was $10,830.39.

The referee held that exclusive of the pro rata interest of the United States in the two funds, the total indebtedness to Commodity amounted to $71,363.04. That figure includes, in addition to the unsatisfied grain claims, $247.01 for a difference in grade allowance and $230.22 for overpaid storage charges. The referee held that such amount was subject to offsets totaling $31,711.46. Of the balance the referee concluded that $28,821.19 was to be paid as a fifth priority and that the $10,830.39, representing the value of receipts acquired after bankruptcy, was allowable as an unsecured claim.

## I.

### The Milo and Wheat Funds

The title to the milo and wheat, which were in the possession of the Grain Company at the time of the adjudication, which passed into the possession of the trustee, and which the trustee converted by sale into the Milo Fund and Wheat Fund, was not in the Grain Company and did not pass to the trustee.[3] Such milo and wheat were held by the Grain Company as bailee, and belonged to the holders of warehouse receipts and the storers of grain who stored on open storage. Such milo and wheat were fungible and became part of the common masses in storage. Each of the owners became tenants in common of their proportionate share of the grain in storage.[4] It follows that the theory of the trustee's pleading in his counterclaim was untenable. There could be no preference with respect to property that belonged to third persons and the title to which was not in the bankrupt.[5] The referee so held.

We need not determine whether the trustee could have brought an interpleader action in the bankruptcy proceeding, rather than a plenary action, had the claimants to the stored grain not invoked the summary bankruptcy jurisdiction to adjudicate their rights in the common masses of stored grain and the Milo Fund and Wheat Fund into which such masses were converted.[6]

---

3. In re Wright-Dana Hardware Co., 2 Cir., 211 F. 908, 911; 11 U.S.C.A. § 110.

4. Central States Corp. v. Luther, 10 Cir., 215 F.2d 38, 45, and cases cited in Note 10, infra.

5. 11 U.S.C.A. § 96, sub. a; 8 C.J.S., Bankruptcy, § 193a, p. 650.

6. See, however, Inter-State National Bank of Kansas City v. Luther, 10 Cir., 221

Here, Commodity and the other claimants filed claims in the bankruptcy proceeding, by which they invoked the summary jurisdiction of the bankruptcy court to adjudicate their rights in such common masses and the funds into which they were converted.[7] By so invoking that jurisdiction, they consented to an adjudication of their claims by the bankruptcy court in the exercise of its summary jurisdiction.[8]

In the trustee's action in interpleader he made the facts alleged in his action to recover part of the interpleader pleadings by reference. We may disregard the action to recover and pass on the rights of the United States and the other claimants on the issues raised by their claims and on the facts alleged in the interpleader and established by the evidence. The interpleader action was not an action to recover back grain that Commodity had received, but, rather, it was an action to have determined the rights of the tenants in common to the grain that remained in the hands of the Grain Company and the possession of which passed to the trustee. The referee did not adjudge that the trustee was entitled to recover back the grain delivered to Commodity after September 30, 1951, on shipping orders presented to the Grain Company. What the referee did do was adjudge that the grain so delivered to Commodity on shipping orders during such period should be considered in determining the rights of Commodity to share with other claimants in such common masses and the funds into which

they had been converted through sale by the trustee.

Since all of such storage claimants, including Commodity, were tenants in common in the common masses, each was entitled to his pro rata share of the grain in storage on September 30, 1951.[9]

The evidence clearly established that there was a very large shortage when Commodity issued its shipping orders and received grain out of the common masses in storage after September 30, 1951; that it was impossible for the Grain Company to deliver the full amount of the stored grain owned by the several claimants; and that Commodity knew such facts and induced the Grain Company to deliver grain to Commodity, to the detriment of the interests therein of other claimants. Since there was a shortage in the stored grain and an insufficient amount to satisfy the lawful claims of all the storage claimants at the time grain was delivered to Commodity on such shipping orders, each storage claimant, including Commodity, was entitled to share in the grain on hand in the proportion that the grain stored by it bore to the total amount of grain stored by the storage claimants.[10] In that proportion, each storage claimant, as a tenant in common, owned an undivided interest in the grain on hand at the time Commodity received grain from the common masses on its shipping orders. It follows that when Commodity received, after September 30, 1951, a portion of its undivided interest in the grain on hand, it was only entitled to re-

---

F.2d 382; and Central States Corp. v. Luther, 10 Cir., 215 F.2d 38.

7. In its claim Commodity expressly alleged that the title to the stored milo and wheat, which came into the possession of the trustee, had never passed to the Grain Company and did not pass to the trustee; that neither the Grain Company nor the trustee had any title, legal or equitable, to such milo and wheat, but were merely bailees thereof; and that if the trustee had sold or otherwise disposed of such milo and wheat, the proceeds of such sales were the property of and should be paid to Commodity.

8. James Talcott, Inc., v. Glavin, 3 Cir., 104 F.2d 851, 853, certiorari denied 308 U.S. 598, 60 S.Ct. 130, 84 L.Ed. 501; Page v. Arkansas Natural Gas Corporation, 8 Cir., 53 F.2d 27, 35, affirmed 286 U.S. 269, 52 S.Ct. 507, 76 L.Ed. 1096; Remington on Bankruptcy, 5 Ed. (Henderson), Vol. 5, § 2200.

9. Central States Corp. v. Luther, 10 Cir., 215 F.2d 38, 45, and cases cited in note 10.

10. Goodman v. Northcutt, 14 Or. 529, 13 P. 485; Dole v. Olmstead, 36 Ill. 150, 155–156.

ceive the remainder of its proportionate interest from the grain remaining in the common masses in storage. To hold otherwise would give Commodity a portion of the grain remaining on hand, which belonged in undivided interests to the other storage claimants. The only way that Commodity could be limited to its proportionate interest of the grain on hand in the common masses on September 30, 1951, was to charge its interest with the amount of grain that was delivered to it out of the short common mass on its shipping orders. That is what the referee did. In other words, the referee did not require Commodity to return any of the grain delivered to it, but simply charged that grain against Commodity's proportionate interest in the common mass of grain which was short. The result is that Commodity received its full proportionate interest in the grain in the common mass which was short, and the other storage claimants will receive their proper proportion of such grain.

We conclude that the referee applied the proper theory in determining the proportionate amounts in the Milo and Wheat Funds to which Commodity was entitled, but because of our conclusion, hereinafter set out, with respect to the rights of Commodity under a warehouse receipt issued to one Hewes and transferred to Commodity, the proportionate amounts to which Commodity was entitled in the Wheat Fund will have to be recalculated.

## II.

### The Storage Guarantee Agreement

The capacity of the Pierceville elevator when completed on October 30, 1950, was 280,000 bushels. In the Storage Guarantee Agreement of April 3, 1950, it was agreed by the Grain Company that upon completion of the facility it would reserve 75 per cent of the storage capacity thereof for grain which might be tendered for storage by Commodity, or by farmers for storage for their account. By Paragraph 7 of such Agreement, the charges payable by the United States for storage and related services for grain handled, stored, or considered to be stored, in the facility were to be at rates prescribed in the Uniform Grain Storage Agreement entered into between the Grain Company and Commodity. In Paragraph 8 of the Guarantee Agreement it was agreed that "if the average occupancy of the facility (based on grain stored or considered to be stored therein) during any year for which this section 8 is operative is less than 75 per cent of the storage capacity" a sum in addition to that provided in Paragraph 7 would be paid to the Grain Company. The method for computation of such additional amount is set out in Paragraph 8. The Guarantee Agreement recited that Commodity desired to encourage the construction of commercial warehouse facilities for the storage of grain in areas where such storage was inadequate; that the Grain Company desired to participate in such program; and that Commodity desired the completion of the Pierceville facility in time to assist in the handling and storage of the 1949 and 1950 wheat, milo and barley crops.

We think it clearly was the intent of the parties, that in order to induce the construction of the Pierceville facility and the setting apart of 75 per cent of the storage of that facility to Commodity and farmers for storage for their account, that if the storage by Commodity and farmers for storage for their account in such facility was less than 75 per cent of capacity, Commodity would reimburse the Grain Company under the provisions of Paragraph 8 of the Guarantee Agreement. Such, we think, is the plain import of the language of the Guarantee Agreement. In order to carry out that intent, it would be necessary to treat the Pierceville facility as an independent facility.

Moreover, in paragraph numbered one of the Guarantee Agreement, it is provided that the Grain Company shall con-

struct a warehouse facility of the following description:

"⊠New elevator
"☐Annex or addition
"Type of construction: concrete
* * *"

It will be observed that the square preceding the phrase "new elevator" is checked and that the square preceding the phrase "annex or addition" is blank.

The Guarantee Agreement further provided that "Unless the facility is an addition or annex to an existing warehouse covered by a Uniform Grain Storage Agreement, the Warehouseman shall qualify for and execute a Uniform Grain Storage Agreement covering the facility promptly after completion."

Commodity and the Grain Company entered into a second Uniform Grain Storage Agreement dated July 1, 1950, —the date it was contemplated the Pierceville facility would be completed, —which covered the Pierceville facility.

Furthermore, the original voucher and the corrected voucher referred to above were predicated entirely on the average occupancy of the Pierceville facility and the amount it fell below 75 per cent of the storage capacity of that facility, and was in nowise based upon storage in or capacity of other facilities of the Grain Company and Commodity made the provisional payment, subject to a final audit without in anywise objecting or excepting to the basis upon which the claim was predicated. Thus, it will be seen that the parties prior to the time any controversy had arisen treated the Pierceville facility as an independent facility and construed the guarantee to be applicable to the amount the average occupancy of the Pierceville facility fell below 75 per cent of its storage capacity, without regard to the capacity of or grain stored in other facilities of the Grain Company.

Where the parties to a contract have given it a practical construction by their conduct, such construction is entitled to great weight in determining its proper interpretation, especially where such practical construction occurred before any controversy arose.[11]

The referee concluded that the Pierceville elevator was a new facility and not an annex or addition.

The referee found that during the year beginning November 1, 1950, and ending October 31, 1951, the aggregate daily average storage for wheat and milo in the three facilities was 482,975 bushels and that such quantity was less than the storage capacity at the Garden City Air Base, a facility which existed at the time of the building of the Pierceville facility under the Guarantee Agreement. The referee then purportedly applied the rate computation schedule in Paragraph 8 of the Guarantee Agreement and arrived at a total liability of $18,900. The referee arrived at that conclusion on the premise that in determining the liability under the Guarantee Agreement all grain in storage between November 1, 1950, and October 31, 1951, must first be credited to the Air Base facility and that only in the event the average daily storage exceeded the capacity of the Air Base facility should grain be considered as stored in the Pierceville facility.

The referee credited the provisional payment of $6,070.72 and adjudged that there was due the Grain Company from Commodity a balance of $12,829.28.

Commodity challenges the conclusion of the referee on two theories. The first theory advanced is that the Pierceville facility was an addition to the existing warehouse at the Air Base and by virtue of the express provisions of Paragraph 6 of the Guarantee Agreement, "all grain delivered to the warehouse by Commodity and farmers for storage for their account shall be considered as first

11. Norton v. Agricultural Bond & Credit Corporation, 10 Cir., 92 F.2d 348, 351, 352, certiorari denied 302 U.S. 763, 58 S.Ct. 409, 82 L.Ed. 592; Commercial Standard Ins. Co. v. Remer, 10 Cir., 119 F.2d 66, 70.

stored in and last removed ·from the facility" and that since the referee found that the aggregate total daily storage for wheat and milo during the operative period of the Guarantee Agreement was in excess of the guaranteed capacity of the Pierceville facility, under an application of Paragraph 6, Commodity fulfilled its guarantee. The second theory advanced, in the alternative, by Commodity is that the Pierceville facility is an independent facility and therefore the provisions of Paragraph 6 of the Guarantee Agreement were inapplicable; that Commodity's liability under the Guarantee Agreement should be based on the amount the average storage of grain by Commodity or by farmers for their account in the Pierceville facility fell below 75 per cent of the storage capacity of such facility; that the referee erred in failing to make any allowance for grain actually in storage, or which should have been in storage, in the Pierceville facility during the period involved; and that the evidence disclosed that large amounts of grain were stored in the Pierceville facility by Commodity or for its account during the period involved.

Both theories were advanced by Commodity in its petition for review and are therefore reviewable here.[12]

For the reasons indicated above, we are of the opinion that the Pierceville facility was a new facility and not an addition or annex. · Paragraph 6 is expressly applicable only to an annex or addition to an existing warehouse and, therefore, has no application here.

We conclude that the alternative theory advanced by Commodity was proper and should have been applied by the referee.

▆ In computing the average daily occupancy of the Pierceville facility, if the Grain Company issued warehouse receipts to Commodity or to farmers for grain stored in that facility, and converted and disposed of that grain, the grain covered by such receipts, though not actually held in storage, should be considered. The Grain Company could not receive grain for storage from Commodity and from farmers, dispose of the grain unlawfully, and then claim a deficiency in the 75 per cent guaranteed storage.

The Guarantee Agreement provided that the Grain Company should keep accurate books, records, and accounts with respect to all transactions relating to grain stored in the Pierceville facility and furnish such reports as Commodity might from time to time request. Admittedly, the Grain Company did not comply with this provision of the Guarantee Agreement. But it is obvious that sufficient books and records are available to enable the trustee to determine the amount of grain stored in the Pierceville facility for Commodity or by farmers for their account and that Commodity has suffered no damage as a result of the Grain Company's failure ·to keep complete and accurate books, records, and accounts.

### III.

### The Hewes Transaction

▆ In July, 1951, J. D. Hewes delivered to the Grain Company for storage in its elevators 486,700 pounds of wheat and the Grain Company issued to him scale tickets therefor, bearing the notation that they represented stored grain. On January 3, 1952, Hewes surrendered the scale tickets and received from the Grain Company a check in part payment for the wheat. On the following day, Hewes returned the check and the Grain Company issued to him a warehouse receipt for 486,700 pounds of wheat. Thereafter, but before bankruptcy, Hewes assigned the warehouse receipt to Commodity as collateral security for a loan. The referee held that such wheat did not constitute a claim against the Wheat Fund, for the reason that when the scale tickets were sur-

12. In re Samuel Wilde's Sons, 2 Cir., 144 F. 972; In re Elmore Cotton Mills, D.C. Ala., 217 F. 810, 819; In re Kellar, 1 Cir., 192 F. 830, 832.

rendered and the check delivered to Hewes, the relationship of bailor and bailee between the Grain Company and Hewes ceased to exist, and the relationship of debtor and creditor came into being, and inasmuch as the Grain Company did not own any stored wheat against which the receipt could have been issued on January 4, and such receipt was not registered, it was invalid and did not create in Commodity any right in the Wheat Fund.

Upon the issuance of the scale tickets to Hewes he became vested with the right to participate as a tenant in common in the common mass of stored wheat. Even though the transaction on January 3 terminated the relationship of bailor and bailee and created the relationship of debtor and creditor, it is clear from the record that on January 4 the parties intended to and undertook to rescind the transaction of January 3 and restore the previous relationship of bailor and bailee which had existed from the time the wheat was actually stored and the scale tickets representing such storage issued. The transactions of January 3 and January 4 were free from fraud on the part of Hewes. He acted in good faith. It is well settled that a sale or contract of sale may be rescinded by agreement or mutual consent of the parties.[13]

Here, it was clearly the intention of the parties manifest by their acts to restore Hewes to the position he occupied prior to the transaction of January 3.[14] The fact that there was not sufficient wheat in storage belonging to the Grain Company to cover the warehouse receipt, we think is immaterial. Likewise, the fact that there was insufficient wheat in store to cover the claims of storage claimants was immaterial. Hewes owned an undivided interest as a tenant in common with the other storage claimants of the wheat in store when he was restored to his former position by the rescission. The transfer of the warehouse receipt transferred that claim to Commodity. We conclude that Commodity was entitled to have the 486,700 pounds of wheat considered in determining its pro rata interest in the Wheat Fund.

## IV.

### Priority and Offset

The referee concluded that the claim of Commodity aggregated $103,594.36. That amount included $32,231.32, payable from the Milo and Wheat Funds, leaving $71,363.04 as a claim against the bankrupt estate. The referee allowed $10,830.39, representing the value of receipts acquired by Commodity after bankruptcy as an unsecured claim, leaving a balance of $60,532.65. The claim of Commodity was subject to offsets aggregating $31,711.46. The referee applied the offsets to such balance and allowed the remainder, or $28,821.19 as a fifth priority.

Commodity contends that the offsets should have been first applied to the unsecured claim and that it should have been awarded $39,651.58 as a fifth priority.

11 U.S.C.A. § 108, sub.b provides that "A set-off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which * * * (2) was purchased by or transferred to him after the filing of the petition * * *." That provision, we think, clearly precludes the off-setting of the unsecured claim against the indebtedness of Commodity to the bankrupt estate, which is, in effect, what Commodity asks us to do.

13. Mangan v. United States, 254 U.S. 494, 497, 41 S.Ct. 157, 65 L.Ed. 370; Monte Vista Farmers' Co-op. Produce Co. v. Bemis Bros. Bag Co., 8 Cir., 294 F. 8, 12, 13; Fadler Co. v. Hesser, 10 Cir., 166 F.2d 904, 907; Riggens v. Pomona Products Co., 82 Ga.App. 636, 61 S.E.

2d 682, 684; Gleaner Harvester Corp. v. Anderson, 148 Kan. 836, 84 P.2d 838; 77 C.J.S., Sales, § 91, p. 778.

14. E. T. C. Corporation v. Title Guarantee & Trust Co., 271 N.Y. 124, 2 N.E. 2d 284, 286, 105 A.L.R. 999.

## V.

### The Measure of Damages

The referee found that the net market price of milo in the warehouse at the inception of bankruptcy was $2.37 per cwt. and the net market price of wheat at the same time and place was $2.23 per bushel, after deducting handling and loading charges. The referee applied those prices in arriving at the amount of Commodity's claim. Commodity contends that the referee should have applied the highest intermediate value between the time of conversion or notice thereof and a reasonable time thereafter; namely, $2.56½ per cwt. for milo, the price on December 10, 1951, and $2.35½ per bushel for wheat, the price on November 27, 1951, on the ground that the milo and wheat had no fixed or stable value and tended to fluctuate from day to day.[15]

The evidence established that Commodity would have sold the milo and wheat in October, 1951, had it been able to obtain delivery from the Grain Company. Commodity learned of the conversions prior to September 30, 1951. On October 16, 1951, its auditor completed his report. The market price in October and early November was less than the market price on the date of bankruptcy. Within a reasonable time after full notice of the conversions, Commodity could have purchased grain on the open market to replace the grain which had been converted,[16] had it desired to do so.

Therefore, assuming without deciding that the "highest intervening price" rule is applicable here, Commodity suffered no injury as a result of the market price applied by the referee.

The cause is remanded, with instructions to modify the order allowing the claim of Commodity in accordance with the views herein expressed.

15. See In re Salmon Weed & Co., 2 Cir., 53 F.2d 335, 79 A.L.R. 379.

16. See In re Salmon Weed & Co., supra.