In re COX COTTON COMPANY d/b/a James Grain & Cotton Co., Debtor.

In re Don JAMES, Robert James and G.E. James, a general partnership, d/b/a Frisbee Cotton Company; James Grain & Elevator, Debtor.

Robert P. LINDSEY, Trustee, Plaintiff,

v.

Mrs. Wayne CRYTS a/k/a Sandy Cryts; William Cryts, Jr.; Evans Ipock; Bill Jewell; and Wayne Cryts, Defendants.

Mrs. Wayne CRYTS a/k/a Sandy Cryts; William Cryts, Jr.; Evans Ipock; Bill Jewell; and Wayne Cryts, Appellants,

v.

Robert P. LINDSEY, Trustee, Appellee.

Bankruptcy Nos. J–80–154–B, J–80–155–B. Adv. No. 800414.

United States District Court, E.D. Arkansas, Jonesboro Division.

Nov. 17, 1982.

Basil V. Hicks, Jr., North Little Rock, Ark., Thomas D. Kershaw, Jr., American Constitutional Rights Ass'n, Klamath Falls, Or., Jack T. Lassiter, Little Rock, Ark., for appellants.

Ben F. Arnold, Little Rock, Ark., A. Jan Thomas, Jr., West Memphis, Ark., Warren E. Dupwe, Jonesboro, Ark., for appellee.

## MEMORANDUM OPINION

EISELE, Chief District Judge.

Pending before the Court is an appeal from a judgment for civil contempt and a certification for criminal contempt entered on June 2, 1982, by Judge Baker of the United States Bankruptcy Court for the Eastern District of Arkansas. The judgment and certification arise out of a complex series of proceedings involving the Cox Cotton Company bankruptcies. The detailed facts surrounding those proceedings and the events leading up to the contempt order can be found elsewhere. *See State of Missouri v. United States Bankruptcy Court,* 647 F.2d 768, 771–74 (8th Cir.1981); *Re: Contempt of Phillip Wayne Cryts, et al.,* AP 80–414 (Bankr.E.D.Ark. July 7, 1982) (memorandum opinion of Judge Baker). For purposes of this appeal the Court will present only a brief background of the facts pertinent to this proceeding.

*Background.*

The bankruptcy petition relevant to this case was filed on August 11, 1980, by the debtors who operated a number of grain elevators, one of which was located in Ristine, Missouri. A trustee, Robert Lindsey, was immediately appointed and given authority to operate the business. On September 23, 1980, he requested authority to sell all the debtors' grain free and clear of all liens and interests. That touched off a storm of protest among the Missouri farmers whose grain was stored in the debtors' elevators. Their actions included barricading entrances to the Ristine elevator, which resulted in United States marshals being assigned there. The principal questions were: who actually owned the grain or quantities thereof in those elevators; how much grain was stored in them; and whether the State of Missouri should be appointed as the proper receiver under the circumstances. The latter issue prompted Missouri and a number of its state agencies to file various actions in federal court in an attempt to obtain jurisdiction over the "Missouri grain." This culminated in a finding by the Eighth Circuit Court of Appeals, in April of 1981, that the federal bankruptcy court had exclusive jurisdiction over debtors' Missouri property, including the grain. *See State of Missouri,* 647 F.2d at 774.

Before that ruling, however, Wayne Cryts and others, on or about February 16, 17 and 18, removed from the debtors' Ristine, Missouri, elevator approximately 31,000 bushels of soybeans. This was done in the presence of the U.S. marshals and the FBI, and involved a convoy of some 77 trucks to transport the soybeans. The beans were taken to a Missouri Farmers Association (MFA) elevator in Bernie, Missouri. Through an order on February 18, 1981, the court of appeals declared that the jurisdictional rights in that grain were expressly reserved to the trustee until that court could resolve jurisdictional issues regarding the debtors' Missouri property.

Following the court of appeals' decision in April on the jurisdictional issue, the bankruptcy court on May 27, 1981, authorized the trustee to sell the "Missouri grain," including the 31,000 bushels in the Bernie, Missouri, elevator. Again, the local farmers became upset and on a number of occasions barricaded the entrances to the Ristine elevator. The significant event, and the one which ultimately led to this appeal, occurred on or about July 22, 1981, when Wayne Cryts and the other appellants, in the early hours of the morning, removed the soybeans from the Bernie elevator and took them to parts unknown. Consequently, the trustee filed his motions for civil contempt proceedings.

During the fall of 1981, the bankruptcy court had difficulty assembling all the parties for an adversary hearing on the contempt motions, and it was not until February 9, 1982, that the first such hearing was held. On that date Wayne Cryts took the witness stand and invoked his Fifth Amendment privilege against self-incrimination when asked who helped him remove the grain from the Bernie elevator, where the grain was taken, and how the grain was disposed of. Judge Baker adjourned the hearing until it could be determined if Wayne Cryts might be granted use immunity in exchange for his testimony. That immunity was granted by this Court on April 1, 1982. Judge Baker reconvened the hearing on April 28, 1982, but Wayne Cryts again refused to answer the trustee's questions. Judge Baker immediately jailed the appellant for civil contempt. On June 1, 1982, appellant was released from jail on the order of Judge Baker because he had come to a decision on the trustee's motion for contempt. The judgment on that motion was entered on June 7, 1981, and the appellants were found to be in civil contempt and were held jointly and severally liable for the sum of $287,708.73 plus $1,500 per day for each day the judgment remained unsatisfied. The amount of the judgment was based on the value of the soybeans taken and the trustee's costs in bringing the contempt action. Judge Baker also certified to this Court a criminal contempt for each appellant. This appeal was then taken.

The Court will first resolve the issues before it with respect to Wayne Cryts. Mr. Cryts presents his claims on three levels: First, the entire Bankruptcy Code is unconstitutional; second, assuming the Code to be constitutional, the contempt provisions of the Code are unconstitutional; and, third, assuming the contempt provisions to be constitutional, the finding of civil contempt as to him was unconstitutional because, under the facts and circumstances of this particular situation, the bankruptcy court lacked jurisdiction over the 31,000 bushels of soybeans in the Bernie Elevator.

*Jurisdiction Over the 31,000 Bushels of Soybeans.*

Addressing appellant's last contention first, the Court finds it to be a rather straightforward theory. Appellant claims he had a right to remove the 31,000 bushels of soybeans from the trustee's possession because the trustee, like the debtors, held those beans solely as a bailee. Therefore, he argues, the beans were not "property of the estate" within the meaning of 11 U.S.C. § 541 because the trustee was a mere possessor of his beans, while he always had, and continued to have, all legal title and ownership in them. Consequently, he contends that the trustee was without authority to use, sell or dispose of the beans, and when he took the beans from the Ristine and the Bernie elevators, he had simply retrieved from the trustee his lawful property. Appellant places great reliance on the Eighth Circuit opinion, which upheld the jurisdiction of the bankruptcy court over the "Missouri grain." *See State of Missouri,* 647 F.2d at 774. In that case the court expressly refused to authorize the trustee to sell the 31,000 bushels of grain located in the Bernie elevator. In order for the trustee to sell that, and all other "Missouri grain," the Court found that the bankruptcy court had to satisfy the requirements of 11 U.S.C. § 363(f) (for text of statute, see *infra*). Appellant contends that none of these requirements were satisfied. Therefore, he argues, the 31,000 bushels of soybeans in the Bernie elevator were, as they always had been, his rightful property and not subject to the power of the trustee.

The Court finds that appellant accurately describes the relationship between a grain depositor holding a warehouse receipt and a warehouseman. That relationship is one of bailor-bailee and actual ownership of the depositor's grain remains with him. In *Potter v. Mt. Vernon Roller Mill Co.,* 101 Mo.App. 581, 583, 73 S.W. 1005 (1903), the court stated:

It is well settled that where a warehouseman has received grain on deposit for its owner, in a common granary or deposito-

ry, where it is mingled with other grain of himself or others, or both, in such receptacle, to which, from day to day, other grain of various owners, of like kind and quality, is added, and from which, from time to time, sales and delivery of grain are made, and the warehouseman keeps constantly on hand grain of the quality received, prepared for delivery on call to all depositors, the contract is a bailment, and not a sale. The circumstances that the identical grain is commingled with other grain, and is not to be returned to the depositor, but a like quantity of the same kind and quality are not sufficient to convert the contract into a sale. (Citations omitted.)

The relationship was described likewise in *United States v. Luther,* 225 F.2d 499, 504 (10th Cir.1955), *cert. denied,* 350 U.S. 947, 76 S.Ct. 321, 100 L.Ed. 825 (1956).

The title to the milo and wheat, which were in the possession of the Grain Company at the time of the adjudication, which passed into the possession of the trustee, and which the trustee converted by sale into the Milo Fund and Wheat Fund, was not in the Grain Company and did not pass to the trustee. Such milo and wheat were held by the Grain Company as bailee, and belonged to the holders of warehouse receipts and the storers of grain who stored on open storage. (Footnote omitted.)

At this point, however, appellant's understanding of the applicable legal principles appears to wane. The court in *Luther* went on to state that:

Such milo and wheat were fungible and became part of the common masses in storage. Each of the owners became tenants in common of their proportionate share of the grain in storage. . . . There could be no preference with respect to property that belonged to third persons and the title to which was not in the bankrupt.

*Id.* (footnote omitted).

The *Luther* case, though decided in pre-Code 1955, resembles the instant case in a remarkable way. There the Grain Compa-

ny went bankrupt and the quantity of grain in storage was substantially less than that required to make a complete return on outstanding warehouse receipts. Despite this knowledge, the Commodity Credit Corporation (CCC) induced the Grain Company, during a four month period preceding the actual filing of the bankruptcy petition, to give it preferential treatment by shipping to it some nine million pounds of grain, thereby further depleting the stores on hand. After the petition was filed, the trustee demanded that the grain shipped to CCC be treated as property of the bankrupt estate. The court agreed and found that the CCC, having knowledge of the Grain Company's bankrupt condition, could not receive preferential treatment. The court held that the CCC's grain was part of the common property of all warehouse receipt holders; therefore, it was entitled only to its pro-rata share. However, the CCC was not required to return the nine million pounds, but the court computed its dollar value and proportionately reduced the CCC's share in the funds which had been received from the trustee's sale of the remaining grain, of which the CCC also had part ownership.

Assuming that Wayne Cryts were in the same position as the CCC in the *Luther* case, he would then be a tenant in common with all others who held warehouse receipts for the grain in the Ristine elevator and therefore could not exercise a preference over those others by removing the grain he claimed as his. But the *Luther* case is even more instructive with respect to the actual situation before this Court. In that case, a certain J.D. Hewes held a warehouse receipt for 486,700 pounds of grain stored with the Grain Company and he asserted a bailor's interest in that grain. The *Luther* court found that he indeed had had such an interest, but had endorsed his warehouse receipt over to the CCC as collateral for a loan. The court found that:

The transfer of [Mr. Hewes'] warehouse receipt transferred that claim to Commodity. We conclude that Commodity was entitled to have the 486,700 pounds

of wheat considered in determining its pro rata interest in the Wheat Fund. *Luther,* 225 F.2d at 509.

This Court sees Wayne Cryts' situation to be identical to Mr. Hewes'. Bankruptcy Judge Baker found that Mr. Cryts had never produced a single warehouse receipt, that was in his name only, for grain in the Ristine elevator. Furthermore, he found that Mr. Cryts had endorsed whatever warehouse receipts he had for Ristine elevator grain over to the CCC in return for a $140,000 crop loan made to him in 1979. Therefore, if any ownership interest in the 31,000 bushels of soybeans at Ristine could have been asserted, the CCC was the proper party to do so.

Whether *Luther* remains good law with the advent of the 1978 Bankruptcy Code—and this Court thinks it does—the Code itself, as Judge Baker found, defeats Wayne Cryts' claim that the bankruptcy court had no jurisdiction over the 31,000 bushels of soybeans he removed from the trustee's possession.

██ The initial issue before Judge Baker was whether the grain in question, as well as all other grain in the Ristine elevator, was "property of the estate" within the meaning of 11 U.S.C. § 541. It appears to be well settled that where property is in the hands of the bankrupt, as bailee, the bailor is entitled to recover that property from the trustee. *Devita Fruit Co. v. FCA Leasing Corp.,* 473 F.2d 585 (6th Cir.1973); *see also Collier on Bankruptcy* ¶ 541.08[2] (14th ed.). The Code, however, does not envision bailors rushing in and physically removing the bailment property. Section 362 of the Code provides for an "automatic stay" that prohibits "any act to obtain possession of property of the estate *or property from the estate.*" 11 U.S.C. § 362(a)(3) (emphasis added). The need for this provision was well recognized by the drafters.

Paragraph (3) stays any act to obtain possession of property of the estate (that is, property of the debtor as of the date of the filing of the petition) or property from the estate (property over which the estate has control or possession). The purpose of this provision is to prevent dismemberment of the estate. Liquidation must proceed in an orderly fashion. Any distribution of property must be by the trustee after he has had an opportunity to familiarize himself with the various rights and interests involved and with the property available for distribution.

Notes of Committee on the Judiciary following 11 U.S.C.A. § 362.

There is no evidence, however, that Wayne Cryts was in the position of a legal bailor of the 31,000 bushels of soybeans he removed from the trustee's possession. The bankruptcy court found that:

Wayne Cryts did not have evidence of legal title to the soybeans. When Mr. Cryts deposited his soybeans into debtors' elevator at Ristine, he received a negotiable warehouse receipt. He endorsed that warehouse receipt to the C.C.C. when he borrowed money from them. There has never been a time when Wayne Cryts had warehouse receipts to present to the Trustee. He has never paid off his loan. He has defaulted on his loan, and all of his rights have been forfeited to the C.C.C.

*Re: Contempt of Phillip Wayne Cryts, et al., supra* at 14.

Furthermore, there is sufficient evidence in the record to conclude that much of the grain at Ristine was in fact owned by the debtors. Judge Baker's findings in his opinion filed May 27, 1981, are critical in this respect.

The entire record of this hearing supports the Trustee's contention that there are conflicting adverse claims to the Missouri grain and that such claims are in a good faith, bona fide dispute as among the various parties, including the Trustee. Certain Missouri farmers (primarily those located in the Ristine, Missouri, area) claim that soybeans allegedly in storage at Trustee's elevator facility at Ristine, Missouri, should be returned to them in kind since there are no bona fide adverse claims to the soybeans. They contend ownership of the soybeans should be vest-

ed in them as a matter of law. The Court rejects this contention. The undisputed evidence clearly shows an inventory of soybeans at the date of the petition at the Ristine elevator of Frisbee Cotton Company in an amount of approximately 100,000 bushels or thereabouts. The testimony of the Trustee and audit records of the Missouri Department of Agriculture received into evidence indicate farmer claims against the soybeans of at least 96,989.92 bushels. However, testimony of the Trustee and the proof of claim of First Tennessee Bank, N.A.-Memphis filed against the Frisbee Cotton Company debtor entity indicates total negotiable warehouse receipts for soybeans at the Ristine location of 10,500 bushels. When these claims are added together, it is clear that an insufficient amount of soybeans is on hand to satisfy all conflicting adverse claims to the soybeans. Further, the Trustee is claiming to own outright some or all of the soybeans not only at Ristine, but in other elevators of the debtor entities in the State of Missouri. The Court finds these claims as to ownership to have a substantial basis in fact and are asserted in good faith and are bona fide. It is at once apparent that should this Court or some appellate court determine that the outstanding warehouse receipts of First Tennessee Bank, N.A.-Memphis are void and invalid under the laws of the State of Missouri, Trustee would have a legitimate claim to ownership of the overage of the soybeans at the Ristine elevator. This amount would be at least 3,000 bushels or thereabouts. No other party has any ownership claim to the overage of soybeans at Ristine. Trustee also claims to own some or all of the soybeans also claimed by farmers at Ristine. These claims of ownership are predicated on a previous sale pre-petition of the soybeans to the Ristine elevator owned by Frisbee Cotton Company with the price to be set or established at some later time at the option of the farmer. These claims are based on contentions of the Trustee that title to the soybeans passed to the debtor entity at the time of delivery across the scales, that the soybeans were in fact not stored and title did not remain in the individual producers. These claims of ownership by the Trustee to the soybeans claimed by the farmers raise serious legal issues under Missouri law which can only be decided after a full hearing and trial. The Court finds that no negotiable warehouse receipts were ever issued at the Ristine facility at the time soybeans or other grain was delivered to the Ristine facility. This occurred only at some later time at considerable difficulty upon the request of an individual producer or other entity. Ordinarily, requests were made for the issuance of warehouse receipt for loan purposes or so that a landlord could substantiate his alleged claim to ownership of the grain. Warehouse receipts at Ristine with respect to soybeans cover approximately 68,467 bushels of the soybeans in inventory with a smaller amount (28,522 bushels) being represented by non-negotiable scale tickets. The Court finds that there are bona fide disputes among the parties as to the validity of each individual warehouse receipt and scale ticket at not only Ristine, but other elevators in Missouri operated pre-petition by the debtor entities and now by Trustee. There is also a question as to the present holders of at least some of the receipts. It appears that some of the warehouse receipts may have been surrendered to the debtor entities prior to the filing of the petition but that the individual producer was not paid. It also appears that certain of the warehouse receipts and/or scale tickets may have been surrendered pre-petition and the individual producer paid by an insufficient fund check drawn on Frisbee Cotton Company. At least two of these checks were issued at the Ristine elevator of Frisbee Cotton Company pre-petition. It also appears from the evidence that many of the Missouri farmers who are claiming to have soybeans stored at the Ristine elevator of the debtor entities and who allegedly own them under negotiable warehouse receipts have in fact pledged

these negotiable warehouse receipts to Commodity Credit Corporation for a pre-petition loan. From the evidence, it appears that a vast majority of the Ristine farmers have pledged by delivery and endorsements their warehouse receipts to Commodity Credit Corporation and have not redeemed the same at the time of this hearing. Under Missouri law, it is clear that the Trustee and/or the debtor entities would not be obligated to return any agricultural commodities to these farmers absent a tender of the outstanding negotiable warehouse receipt.

*Lindsey, Trustee v. First Tennessee Bank, et al.,* Adv.Proc. No. 800414, pp. 9–12 (May 27, 1981) (mem. op. of Judge Baker granting Trustee's motion to sell debtor's "Missouri grain.").

■ Recognizing that the nature and extent of a debtor's property rights are generally determined with respect to state law in a bankruptcy proceeding, *Segal v. Rochelle,* 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966), Judge Baker found that the trustee had a legally protected lien interest in the Ristine grain. Missouri law provides that:

A warehouseman has a lien against the bailor on the goods covered by a warehouse receipt or on the proceeds thereof in his possession for charges for storage or transportation (including demurrage and terminal charges), insurance, labor, or charges present or future in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law.

V.A.M.S. 400.7–209(1). Applying that statute Judge Baker found that:

[N]either the Commodity Credit Corporation nor Missouri farmers have paid the Trustee any storage fees on the grain post-petition and for some time in certain instances pre-petition. The Trustee claims that approximately $450,000 in storage is due him as of this time from the depositors of the Missouri grain.

*Lindsey,* at 15.

■ With these facts in mind, Judge Baker concluded that the grain at Ristine, as well as the grain removed by Wayne

Cryts to Bernie, was property of the bankrupt estate within the meaning of section 541. This Court agrees with that conclusion. With respect to Wayne Cryts, he did not show that he had a valid warehouse receipt for the 31,000 bushels of grain he removed from Ristine. Moreover, had he made such a showing, he would still have remained a tenant in common with the other grain owners and legally bound by the Code to leave his claimed portion in the possession of the trustee until some proper method of disbursement and apportionment could be effectuated.

■ It was with this complexity of claims in mind that Judge Baker turned to the Code for a solution of the problem dealing with the grain. He found it in section 363(f), which states:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of such interest;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

One might even conclude that the Code drafters had Judge Baker's dilemma in mind when they wrote this section. Despite appellant's claims to the contrary, this Court finds section 363(f) was applicable to the facts of this case and that Judge Baker properly applied it.

First, Judge Baker found that the requirements of section (4) had been met.

[The] Trustee may sell property of the estate free and clear of any interests in such property of an entity other than the

estate if such interest is in bona fide dispute which as a matter of law this Court finds that Trustee has shown by a preponderance of the evidence and to the satisfaction of this Court as is required by the above section of the United States Bankruptcy Code.

*Lindsey,* at 19.

The judge justified his conclusion by finding that:

[N]ot only would it unduly complicate matters for the Trustee to even attempt to make a redelivery of the grain, but the same could well expose him to personal liability and favor one class of claimants over another since no claims to the grain have yet been finally adjudicated by this Court as to validity, nature, priority, and/or value. The Trustee simply does not know to any reasonable degree of certainty what amount of grain the debtor entities started with at each location and the Trustee has no way of knowing in any exact sense the present quantity or quality of the grain at each location. The Court also knows from the testimony that it will take four (4) to six (6) months to sell, deliver, and receive payment of the grain if the process is started in the immediate future. During this period of time, the quality of the grain could well change and the condition of the grain could well deteriorate further. Should redelivery of the grain occur, the first few recipients might well receive a fair quantity of the grain in good condition but later recipients might not receive any grain or it any at all [sic] and it could be in a vastly different and/or inferior condition. At the end of the redelivery process, there might not be enough grain to cover all demands. The Court rejects this proposal and contention of certain Missouri farmers as being totally inequitable and impractical under the circumstances and the evidence presented.

*Id.* at 21.

Judge Baker also found authority to allow the trustee to sell the grain pursuant to section (5).

As a matter of law under various provisions of the Missouri Uniform Commercial Code and the Missouri Grain Warehouse Law for purposes of 11 U.S.C. § 363(f)(5), various entities claiming the grain could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest. That the provisions of Missouri law which cause this Court to reach this conclusion are fully set forth in the pre-trial brief of the Trustee and include Missouri Revised Statutes 400.7–206; 400.7–209; 400.7–210; 411.519(6); and 411.671. That under the laws and the statutes of the State of Missouri, as a matter of law the Trustee in this type of situation (where in addition the warehouseman can compel interpleader relief under Missouri Revised Statute 411.7–603) can compel the adverse claimants to the grain to take a money satisfaction of their interests. The Court concludes that any other conclusion of law would be inappropriate under the peculiar facts and circumstances of this proceeding and would subject Trustee to possible multiple liability and even personal exposure should this Court hold otherwise.

*Id.* at 19–20.

In conclusion, the bankruptcy court found that those with ownership interests in the grain to be sold would receive "adequate protection" required under 11 U.S.C. § 361.

[T]his Court concludes as a matter of law that all ownership claims, lien claims, UCC security interests, equitable claims, storage claims, landlord claims, and whatever other claims may exist to the net sale proceeds shall specifically attach to said proceeds and shall be fully heard and determined by this Court at some later time pursuant to the appropriate notice and opportunity for hearing consistent with the needs of the parties and their attorneys.

*Id.* at 24.

The bankruptcy court also provided adequate protection by seeing that the grain was stored and treated properly to prevent further deterioration.

In the final analysis, this Court finds that the trustee had authority to act with respect to the "Missouri grain," including the 31,000 bushels of soybeans that Wayne Cryts removed first from the Ristine elevator and later from the Bernie elevator. Mr. Cryts, even had he been a lawful bailor of that grain—which this Court finds he was not—had no right to remove it from the possession of the trustee. Mr. Cryts had no legal basis for receiving preferential treatment over the other owners by removing 31,000 bushels of the common grain. The Code, in fact, expressly prohibits such an action. Furthermore, the grain in storage was beginning to deteriorate. Faced with the competing ownership claims of the trustee, farmers and farmers' creditors and the fact that there was an insufficient amount of grain in storage to satisfy the outstanding claims of all the storage claimants, the bankruptcy court acted properly in authorizing the sale of the grain, having the proceeds deposited into a fund, and authorizing disbursements from the fund as individual claims were resolved.

*Constitutionality of Bankruptcy Judge's Contempt Powers.*

The appellant argues that the contempt power exercised by Judge Baker is unconstitutional. The appellee disagrees and contends that the broad grant of contempt powers to the bankruptcy judges under the 1978 Code is constitutional. He further argues that the contempt power has always been recognized as a power inherent in both the judge and the court of bankruptcy.

In order to appropriately deal with these issues, it is necessary to develop a historical perspective. A concise summary of the development of the bankruptcy system from the time of the enactment of the Bankruptcy Act of 1898 is found in the legislative history of the 1978 Code.

The system as it operates today was not enacted in its present form. It has evolved over the past 80 years from a far different system. In 1898, when the Bankruptcy Act was enacted, referees were not salaried officers of the United States. They were appointed for 2-year terms, paid on a commission (fee) basis, and not used as extensively as they are under present law. The reference of a bankruptcy case was not automatic; the referees' orders were not given the same finality as under present law; and review of referee's decisions and orders by district judges was by "petition for review" rather than by appeal.

Referees originally were required to perform many purely ministerial functions; their judicial role was minor. The referee was not conceived of as a judge or a judicial officer, but rather as a supervisor and administrator of a bankruptcy case. His judicial functions grew from his role of administering an estate: when disagreements arose in the administration of a case, he would decide them, subject to review by the district court. Though the administration of a bankruptcy case was entrusted to a non-judicial officer, most of the litigation that arose in bankruptcy cases in 1898 was entrusted to Federal district or State courts. The referees only decided those matters relating to property over which they had direct control, matters referred to them as special masters by judges, and matters submitted by consent of the parties. The Act vests jurisdiction "of all controversies at law and in equity, as distinguished from proceedings in bankruptcy," in the courts in which the matter in dispute would have been decided in the absence of bankruptcy.

Beginning in 1938, the position of referee began to change. The Chandler Act made the referee more of a judicial officer. It removed many of the referees' administrative duties and lodged them elsewhere, either in the trustee or the clerk. In 1946, referees were removed from the fee system and made salaried officers of the district courts. The universally deplored fee system, which gave referees an incentive to decide disputes in favor of the estate, was repealed in view of the referee's expanded judicial and diminished administrative role. When the referee was acting as a collection officer, a fee system was acceptable.

When he became a judicial officer, a fee system was wholly out of place, and possibly unconstitutional. The 1946 legislation also extended the terms of referees from 2 to 6 years. Legislation in 1966 prohibited referees from acting as trustees or receivers in bankruptcy cases, an inappropriate activity for a judicial officer.

In 1973, the Rules of Bankruptcy Procedure, promulgated by the Supreme Court on the recommendation of the Judicial Conference, went further to recognize the judicial status of referees. The title of the office was changed to bankruptcy judge. The jurisdiction over disputes was de facto expanded by a clarification of what constituted consent to jurisdiction by an adverse party. More of the bankruptcy judge's administrative duties were removed from him. The thrust of the Bankruptcy Rules, more than any change in the preceding 40 years, was to recognize the judicial character of the office of bankruptcy judge, and the primary judicial nature of the work the bankruptcy judge performs and the contact creditors and debtor alike have with the bankruptcy judge. In the words of the Judicial Conference's Advisory Committee on Bankruptcy Rules:

> [t]here has been a purpose to emphasize the judicial in contradistinction to the ministerial functions of the referee in bankruptcy administration and to enhance the dignity of the office as that of the principal judge of the bankruptcy court.

The result of these developments in the law has been to recognize the bankruptcy judge as a regular judicial official that handles only bankruptcy cases. Thus, bankruptcy judges today comprise a de facto specialized court system within the district courts. District judges become involved very little in the administration of or decisions in bankruptcy cases. Approximately 190 full-time and 30 part-time bankruptcy judges throughout the country handle the approximately 250,000 cases now pending in the courts with little direct supervision from the district judges.

As the system has evolved, district judges have removed themselves further and further from the consideration of bankruptcy matters. The area has become too specialized and requires too much expertise to be able to be handled on an ad hoc basis by a generalist. The district court bench has generally recognized this fact and left bankruptcy matters to the bankruptcy judges. The only control the district judges still retain is in the appointment and removal process, in hearing appeals of bankruptcy judges' decisions, and in the exercise of certain powers reserved to the district courts by statute [power to enjoin another court (11 U.S.C. 11a(15)); *power to punish for contempt* (11 U.S.C. 11a(16), 69)].

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 8–9 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5969–5971 (footnotes omitted) (emphasis added). *See also* Merrick, *Constitutional Chaos: Rodrock v. Security Industrial Bank,* 2 N.Ill.U.L.Rev. 167 (1982) (giving a detailed history of the development of bankruptcy law).

This brief history clarifies certain aspects of the bankruptcy system that are critical to a proper understanding of the case law addressing the issue of the contempt powers of the "bankruptcy court" prior to the 1978 Code. The "bankruptcy court," prior to the 1978 Code, was the federal district court. Until the 1978 Code, there was never in existence a "court of bankruptcy" independent of, or separate from, the federal district court. The "bankruptcy judge," prior to the adoption of the 1973 Rules, was the district court judge. The administrative officer who became titled "bankruptcy judge" under the 1973 Rules had theretofore always been called a "referee." In sum, the *jurisdiction* to resolve bankruptcy matters, prior to the 1978 Code, was vested in the federal district court *as the bankruptcy court.* The referee in bankruptcy, made "judge" by court Rule after 1973, was an officer of the district court and functioned like a special master in the early years and similar to a magistrate in the later years

prior to the 1978 Code. With these clarifications and distinctions in mind, an analysis of the case law that deals with the contempt power of the "bankruptcy court" can more readily and understandably be made.

The seminal case recognizing the existence of the contempt power in the "bankruptcy court" is *Boyd v. Glucklich,* 116 F. 131 (8th Cir.1902). Although cited by the appellee, courts and legal treatises for the proposition that the "bankruptcy court" is possessed of broad inherent contempt powers, a careful reading of the case shows that it hurts, rather than helps, appellee's position here. In *Boyd* the referee ordered the defendant to turn over certain property to the trustee. The defendant appealed to the district court, which upheld the referee's order and further ordered the defendant to turn over the property in ten days or be jailed for contempt. The court of appeals reversed because of due process problems regarding the initial determination of whether the trustee was entitled to the defendant's property. In doing so, however, the court addressed the issue of the contempt power of the "courts of bankruptcy."

> Frequent reference is made to section 41 of the bankrupt act, as though that act invested courts of bankruptcy with broader and larger powers to punish for contempt than is possessed by other United States courts. It does nothing of the kind. This section does not in express terms confer on the court of bankruptcy the power to punish for contempt. But no such enactment was necessary. The moment the court was called into existence it became possessed of this power by the operation of the common law, as well as by section 725 of the Revised Statutes of the United States. *The reference to the power to punish for contempt in section 41 of the bankrupt act was not to confer the power on the court of bankruptcy,* for its creation alone invested it with the power, *but it was to make it plain that the power was not conferred on referees in bankruptcy,* and to confer it on the "judge" of the court of bankruptcy, who could not exercise the power

in the absence of the statute expressly conferring it. This is done by section 41b, in these terms:

> "(b) The referee shall certify the facts to the judge, if any person shall do any of the things forbidden in this section. The judge shall thereupon, in a summary manner, hear the evidence as to the acts complained of, and, if it is such as to warrant him in so doing, punish such person in the same manner and to the same extent as for a contempt committed before the court of bankruptcy.  * * * "

> By reference to section 41 it will be seen that "the things forbidden in this section," concerning which the referee is required to certify the facts to the judge, include only those things which would be punishable as contempts by all courts of record. They are the common and familiar heads for the exercise of this jurisdiction by all courts of record. No new or enlarged jurisdiction is conferred, and no power to impose a punishment which might not rightly and lawfully be imposed, on a similar state of facts, by any other United States court. Any act, matter, or thing which any United States court may punish as a contempt may be punished as such by a court of bankruptcy; and any act, matter, or thing which cannot be punished as a contempt by other United States courts cannot be punished as such by a court of bankruptcy. Moreover, the mode of proceeding in a court of bankruptcy to determine whether a constructive contempt has been committed should conform to the established practice in like cases in all other United States courts as near as may be, and what is legally sufficient to purge a contempt in the other courts of the United States is sufficient to purge the like contempt in a court of bankruptcy.

*Id.* at 135 (emphasis added).

The *Boyd* decision, therefore, stands for the proposition that when the federal district court, an Article III court, was vested with bankruptcy jurisdiction, and then acted in its capacity as the "court of bankrupt-

cy," it became inherently vested with the power of contempt to deal with bankruptcy matters. That power was not exceeded by finding a contempt where the contemptuous behavior occurred before the referee and the referee certified those facts to the district court judge. The *Boyd* case cannot be read as supporting the proposition that the "bankruptcy court" of the 1978 Code, an entity "separate" from the district court, has inherent contempt powers. Following *Boyd*, those cases where the "bankruptcy court" imposed contempt sanctions show that the power was actually exercised by a judge of a United States District Court. *See, e.g., Morehouse v. Giant Powder Co.,* 206 F. 24 (9th Cir.1913) (fine for disposing of bankrupt's property upheld); *In re Fortunaxo,* 123 F. 622 (S.D.N.Y.1903).

The *Boyd* case and decisions subsequent to it are also clear in holding that the referee, at least prior to the adoption of the 1973 Rules, had no power to punish for contempt. Only the district court judge, acting in his capacity of judge of the bankruptcy court had that power. *In re Rubin,* 378 F.2d 104 (3d Cir.1967); *O'Hagan v. Blythe,* 354 F.2d 83 (2d Cir.1965); *In re Haring,* 193 F. 168, 170–73 (W.D.Mich.1912), *aff'd,* 203 F. 229 (6th Cir.), *cert. denied,* 229 U.S. 621, 33 S.Ct. 1049, 57 L.Ed. 1355 (1913). The applicable statute required the referee to certify to the district judge the facts giving rise to the alleged contempt. 11 U.S.C. § 69(b). In sum, it is conclusive that until the adoption of the 1973 Rules, the power of contempt in bankruptcy proceedings was vested exclusively in the district court judge acting in his capacity as judge of "the bankruptcy court," which court was in fact the United States District Court.

In 1973, the United States Supreme Court adopted the Rules of Bankruptcy Procedure. 411 U.S. 989, 93 S.Ct. 3081, 37 L.Ed.2d xxxi (1973). For the first time the bankruptcy referees (called "bankruptcy judges" thereunder) were granted a limited power of contempt pursuant to Rule 920. The essence of that rule is that a referee could punish both civil and criminal contemptuous behavior prohibited by 11 U.S.C. § 69(a)(2) by imposing a fine of not more than $250. If the referee believed the contemptuous behavior warranted imprisonment or a fine greater than $250, he was required to certify the facts to the district judge for disposition. The rationale for this limited power of contempt was expressed in the Advisory Committee's Note accompanying Rule 920.

> Paragraph (4) of subdivision (a) of this rule retains for all but minor contempts the certification procedure of § 41b of the Act [section 69(b) of this title]. If it appears to a referee that conduct in proceedings before him may warrant imprisonment or a fine of more than $250, the referee should proceed under this paragraph. The referee may proceed under paragraph (1) or (2) of the subdivision to determine and punish conduct prohibited by § 41a of the Act [section 69(a) of this title], but paragraph (3) limits the punishment that can be meted out by the referee to a fine of not more than $250. The premise of the change in procedure for dealing with minor contempts is that the certification requirement of § 41b of the Act [section 69(b) of this title] has in effect deprived the referee of the necessary power to protect proceedings before him from petty disturbances and acts of disobedience because of the inordinate inconvenience entailed by the statutory procedure for the judge and the referee.

Rule 920 was not adopted without criticism. Justice Douglas voiced a strong dissent: "Extension of the contempt power to administrative arms of the bankruptcy court is not consistent with the close confinement of the contempt power.... I would not extend the contempt power to bankruptcy referees." 411 U.S. at 994, 93 S.Ct. at 3083, 37 L.Ed.2d xxxii. As Justice Douglas also pointed out, the issue of referees exercising the contempt power had never come before the Court. *Id.* It is also clear that the issue, in a constitutional "case and controversy" context, has never been—even until the present date—addressed by the United States Supreme Court.

Following the adoption of Rule 920, and prior to the 1978 Code, the referee's new

power of contempt was noted by five appellate courts, but its constitutionality was never expressly addressed. *See In re Lahm Industries, Inc.,* 609 F.2d 567 (1st Cir.1979) (bankruptcy referee certified facts to district court pursuant to Rule 920, but finding of contempt by district court was reversed for procedural infirmities); *In the Matter of Baum,* 606 F.2d 592 (5th Cir.1975) (referee imposed $250 fine for contempt but court reversed because conduct found not contemptuous); *Fernos-Lopez v. United States District Court,* 599 F.2d 1087 (1st Cir.), *cert. denied,* 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979) (power of referee under Rule 920 upheld but reversed contempt finding for failure to follow Rule 920 procedures properly); *Fidelity Mortgage Investors v. Camelia Builders, Inc.,* 550 F.2d 47 (2d Cir.1976) (court upheld contempt for automatic stay violation entered by district court pursuant to referee's certification of facts under Rule 920); *Block v. Consino,* 535 F.2d 1165 (9th Cir.1976) (referee's certification of facts to district court for contempt order without first holding a hearing before referee held proper under Rule 920).

The federal district courts that heard cases involving Rule 920 likewise never addressed its constitutionality, but seemed to accept its legitimacy. *See In the Matter of Bon Voyage Travel Agency,* 449 F.Supp. 250 (N.D.Ill.1978); *United Merchants and Manufacturers, Inc. v. Goldenberg,* 447 F.Supp. 918 (N.D.Tex.1978); *In the Matter of Verran,* 40 AFTR2d 77–5124 (E.D.Mich. 1977); *Ben Hyman & Co. v. Fulton Nat'l. Bank,* 423 F.Supp. 1006 (N.D.Ga.1976); *Preferred Surfacing, Inc. v. Gwinnett Bank & Trust Co.,* 400 F.Supp. 280 (N.D.Ga.1975); *In re Shelor,* 391 F.Supp. 384 (W.D.Va. 1975).

The passage of the Bankruptcy Reform Act of 1978 brought with it a broad expansion of the contempt power of the bankruptcy referee, now "bankruptcy judge." Two provisions of the 1978 Code vest the bankruptcy judge with those powers. Title 11 U.S.C. § 105(a) states:

The bankruptcy court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.

Title 28 U.S.C. § 1481 states:

A bankruptcy court shall have the powers of a court of equity, law, and admiralty, but may not enjoin another court or punish a criminal contempt not committed in the presence of the judge of the court or warranting a punishment of imprisonment.

It is reasonable to conclude, as far as these statutes are concerned, that the bankruptcy judge may now exercise the power of contempt to the same extent as the district court judge may, with the exception regarding the criminal contempt power. It is also clear that the bankruptcy judges can exercise their new contempt powers at this time, although the effective date of section 1481 is April 1, 1984. *See* Pub.L. 95–598, Title IV, § 405, Nov. 6, 1978, 92 Stat. 2686.

As with the limited contempt powers conferred under Rule 920, the courts have not addressed the constitutionality of the expanded contempt powers of the bankruptcy judge. However, the question of whether Rule 920 remains as the applicable standard for the exercise of the contempt power in light of section 1481 has been addressed.

With respect to the latter issue, the United States District Court for the Northern District of Illinois in *Horace v. Moore,* 24 B.R. 892 (N.D.Ill.1982), seems to be of the opinion that the broad power under section 1481 is limited by Rule 920.

The plaintiff has filed a motion to enforce an order of the Bankruptcy Judge Hertz which recommended that the bankrupt Henry B. Moore be fined $1,066 and evicted from property known as 3008 Greenwood Road, Hazelcrest, Illinois. The appeal is taken because a bankruptcy judge can impose a fine of only $250 for contempt under Rule 920(a)(4). Upon certification of the contempt order to this court, we are empowered under the Rule to proceed as though the contempt was committed here.

The district court then held the plaintiff in contempt on its own authority. In another

case from that same district, *In re Bazan,* No. 80–C–6789 (N.D.Ill. Aug. 6, 1981) (slip op. of Judge Aspen), the court simply noted that the bankruptcy judge's contempt fines of $100 and $150 were within his power, citing both Rule 920 and section 1481. However, the appellants' conduct was held not contemptuous.

The bankruptcy courts have been inconsistent in construing Rule 920 with section 1481. Some appear to have adopted the position that, to the extent that rule 920 is inconsistent with section 1481, the latter controls. *In re Eisenberg,* 7 B.R. 683, 691 (Bkrtcy.1980) ("Thus, to the extent that Fed.R.Bankr.P. 920(a)(3) places a $250 limitation on the power of bankruptcy judges to fine as punishment for civil contempt or criminal contempt in his presence, it is inconsistent with the Bankruptcy Reform Act and is of no further force and effect. See Bankruptcy Reform Act section 405(d)"). *Accord In re Stacy,* 21 B.R. 49 (Bkrtcy.W.D. Va.1982). Where section 1481 is found to control, some bankruptcy courts have applied it with vigor. *See In re Myers,* 18 B.R. 362 (Bkrtcy.E.D.Va.1982) ($10,000 fine for violating a discharge injunction); *In re Martin-Trigona,* 16 B.R. 792 (Bkrtcy.D. Conn.1982) (bankruptcy judge jailed debtor for contempt without certifying facts to district court); *In the Matter of Lowe,* 18 B.R. 20 (Bkrtcy.N.D.Ga.1981) (contempt power used to suspend attorney from practice before bankruptcy court). A significant number of bankruptcy judges, however, apparently find Rule 920 to be a limitation on their section 1481 powers. *See In re Mealey,* 16 B.R. 800 (Bkrtcy.E.D.Pa.1982) (court imposed $250 fine following Rule 920(a)(3) without considering section 1481); *In re Norton,* 15 B.R. 623 (Bkrtcy.E.D.Pa. 1982) (court fined IRS $150 following Rule 920(a)(3)); *In re Mantolesky,* 14 B.R. 973, 979 (Bkrtcy.D.Mass.1981) ("Bankruptcy Rule 920 specifies the limits of the court's contempt power...."); *In the Matter of Pal Transportation, Inc.,* 13 B.R. 935 (Bkrtcy.M.D.Fla.1981); *In re Kings Row Fireplace Shops of Rivergate,* 1 B.R. 720, 722 (Bkrtcy.M.D.Tenn.1979) ("Pursuant to Bankruptcy Rule 920(a)(3) this court may

not impose a fine of more than $250 as punishment for any contempt, civil or criminal.").

Few courts have made mention of the more fundamental issue: whether the "bankruptcy court" under Rule 920 or as constituted under the 1978 Act can constitutionally be empowered to punish for contempt. Those cases that have addressed the contempt power of the bankruptcy court usually contain a general statement that such a power is "inherent in all courts" and therefore is inherent in the bankruptcy court established under the 1978 Code. Each such case then cites *Boyd v. Glucklich* as the authority for such conclusion. *See, e.g., Fernos-Lopez v. United States District Court,* 599 F.2d at 1090 (upholding power of the "bankruptcy court" (i.e. district court) to punish contempts done in front of referee when certified to district court pursuant to Rule 920); *Ben Hyman & Co. v. Fulton Nat'l. Bank,* 423 F.Supp. at 1011 (addressing power of referee to impose $200 penalty for contempt under Rule 920); *Preferred Surfacing, Inc. v. Gwinnett Bank & Trust Co.,* 400 F.Supp. at 284–85 (addressing fine of $200 imposed by referee under Rule 920); *In re Reed,* 11 B.R. 258, 261 (Bkrtcy.D.Utah 1981) (In justifying the contempt powers under the 1978 Code, the bankruptcy judge held that: "It was early determined that bankruptcy courts, as courts of equity, even without statutory authorization, possessed this power.") (citing *Boyd*).

The difficulty encountered in using these cases, particularly *Reed,* as precedent for the constitutionality of a referee's contempt power under Rule 920, or a bankruptcy judge's contempt power under sections 105 and 1481, is the logical non-sequitor (discussed *supra*) presented in each of these cases. Recall that *Boyd* held simply that the district court, when constituted as the bankruptcy court, was vested with the power of contempt over bankruptcy matters. These cases, in applying *Boyd,* appear to be victims of a semantic and historical confusion. This is because each appears to view the bankruptcy court, as it existed subsequent to the adoption of the 1973 Rules but

prior to the 1978 Code, as an entity separate from the district court. Functionally this may have been true, but in a statutory, legal sense it was not. The referee in *Boyd* may have been given the title "judge" in 1973, but the bankruptcy court was still the district court, and remained so, until the 1978 Code was enacted. Therefore, any "inherent power of contempt," of which the pre-1978 Code cases spoke, could only have existed in the United States District Court. What limited powers of contempt that appear to be vested in the referee (or "bankruptcy judge") by Rule 920 exist only by virtue of that Rule's being adopted by the Supreme Court.

With the enactment of the 1978 Code, however, there was created a different entity called the "bankruptcy court" that probably is intended to exist separately from the district court. But, if so, that new "court" could not "inherit" contempt powers of the district court solely by virtue of the fact that it was once one and the same as that court. Rather, if the bankruptcy court and its judges have any contempt power at all under the 1978 Code, that grant of authority must have a constitutional basis.

■ The issue squarely before this Court, then, is a novel one. The trustee's assertions to the contrary, neither *Boyd* nor the subsequent case law quoting it is controlling on the question of whether the power of civil contempt vested in the bankruptcy judge under the 1978 Code is constitutional. A careful and more searching inquiry is therefore necessary.

It is also noted at the outset that only the civil contempt power and the power to fine for criminal contempts committed in the presence of the bankruptcy judge are at issue here, since the 1978 statute prohibits the bankruptcy judge from punishing for a criminal contempt not committed in his presence or for a criminal contempt warranting a punishment of imprisonment. 28 U.S.C. § 1481.

This Court's analysis of the contempt power of the bankruptcy court will proceed along a number of lines. First is the question of the contempt power itself: in the federal system, is it inherent in all courts or only courts established pursuant to Article III of the Constitution? Because the new bankruptcy courts are not Article III courts (even though, perhaps, they may be "adjuncts" of such courts), the question arises whether Congress has the authority to vest in them the contempt power. Critical to the analysis is what "type" of court the new bankruptcy court is, and whether the contempt power is a "judicial power" that Congress may only vest in Article III courts, the courts authorized by the Constitution to exercise the "judicial power of the United States."

The power of a court to punish for contempt is one of necessity.

> We start with the premise that the right of courts to conduct their business in an untrammeled way lies at the foundation of our system of government and that courts necessarily must possess the means of punishing for contempt when conduct tends directly to prevent the discharge of their functions.

*Wood v. Georgia,* 370 U.S. 375, 383, 82 S.Ct. 1364, 1369, 8 L.Ed.2d 569 (1962). Nevertheless, the contempt power

> can only be exercised to insure order and decorum in their presence, to secure faithfulness on the part of their officers in their official transactions, and to enforce obedience to their lawful orders, judgments, and processes.

*Ex parte Robinson,* 86 U.S. (19 Wall.) 505, 511, 22 L.Ed. 205 (1873). The source of the contempt power appears to be undisputed.

> The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power.

*Id.* at 510. In a definitive statement on the power of contempt, the Supreme Court stated:

> That the power to punish for contempts is inherent in all courts, has been many times decided and may be regarded as settled law. It is essential to the administration of justice. The courts of the United States, when called into existence

and vested with jurisdiction over any subject, at once become possessed of the power. So far as the inferior federal courts are concerned, however, it is not beyond the authority of Congress (*Ex parte Robinson* [86 U.S.], 19 Wall. 505, 510–511, 22 L.Ed. 205; *Bessette v. W.B. Conkey Col.,* 194 U.S. 324, 326, 24 S.Ct. 665 [666], 48 L.Ed. 997); but the attributes which inhere in that power and are inseparable from it can neither be abrogated nor rendered practically inoperative. That it may be regulated within limits not precisely defined may not be doubted.

*Michaelson v. United States,* 266 U.S. 42, 65–66, 45 S.Ct. 18, 19–20, 69 L.Ed. 162 (1924). The contempt power of the federal courts is set out in 18 U.S.C. § 401, which states as follows:

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

From the foregoing, a clear rule emerges: the contempt power is inherent in the "courts" of the United States, but the power is subject to limited regulation by Congress. This Court is then left with two fundamental questions: (1) does the contempt power that inheres in these courts flow from the "judicial power" of Article III, that is, does it arise by the mere creation of a "court" of the United States or does it arise by specific Congressional fiat; and (2) does the term "court" of the United States found in the case law and statutes include the "court of bankruptcy" as it exists today under the 1978 Act?

It would seem that because Congress can place some limits on the contempt power, it does not necessarily follow that Congress can also make a grant of that power outside of the confines of Article III. If that were so, Congress could vest the contempt power in any decision-making body it chose to term a "court" or even in agencies it did not choose to call "courts." An early and precise answer to this question was given in an often quoted opinion of the Eighth Circuit Court of Appeals.

The power of the national courts to enforce obedience, and to punish disobedience, of their orders, *is not derived from the acts of congress* (Rev.St. § 725), *but from the grant to them of all the judicial power of the nation by section I of article 3 of the constitution,* which declares that "the judicial power of the United States shall be vested in one supreme court and in such inferior courts as the congress may from time to time ordain and establish." The grant of the judicial power of the United States to these courts ex vi termini vested them with authority to enforce obedience to their orders and to punish disobedience and contempt of their authority by fine and imprisonment, because this authority is an attribute of judicial power as inherent and indispensable as a judge.

*In re Nevitt,* 117 F. 448, 455 (8th Cir.1902) (emphasis added). *See also Ex parte Hudgings,* 249 U.S. 378, 383, 39 S.Ct. 337, 339, 63 L.Ed. 656 (1919) (the contempt power exists "within the limits of and [is] sanctioned by the Constitution . . . ."). This statement clearly shows that Congress cannot freely confer the contempt power. It must first vest the "judicial power of the United States" (of which the contempt power is a necessary attribute) in some "inferior court." It may then, within narrow limits, restrict and regulate the use of such inherent contempt powers. *See Michaelson v. United States,* quoted *supra.* But the grant of such powers is exercised by the Congress through its power to "ordain and establish" inferior courts under Article III. From this analysis it would then follow that if a court, created by an act of the United States Congress, is not established pursuant to Article III, it could not possess the contempt power. The Court believes this proposition

to be an accurate statement of the current status of constitutional law on this issue. Nevertheless, the underlying rationale for this rule must be explored to fully understand its ramifications.

This Court is aware of the cases, beginning with *American Insurance Co. v. Canter,* 26 U.S. (1 Pet.) 511, 7 L.Ed. 242 (1828), and up to *Palmore v. United States,* 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973), which have addressed the authority of Congress to establish courts other than by use of the Article III power. In none of those cases, however, did the Supreme Court deal with the issue whether a non-Article III court could be vested with the contempt power or some portion thereof. Nevertheless, the limitations on Congress to vest the judicial power of Article III in non-Article III courts has been made clear. Chief Justice Marshall set down the rule in the *Canter* case when he addressed the authority of Congress to vest the judicial power in the Territorial Courts.

> These Courts, then, are not constitutional Courts, in which the judicial power conferred by the Constitution on the general government can be deposited. They are incapable of receiving it. They are legislative Courts, created in virtue of the general right of sovereignty which exists in the government, or in virtue of that clause which enables Congress to make all needful rules and regulations respecting the territory belonging to the United States. The jurisdiction with which they are invested, is not a part of that judicial power which is defined in the 3d article of the Constitution, but is conferred by Congress, in the execution of those general powers which that body possesses over the territories of the United States.

*Canter,* 26 U.S. at 546.

Clearly then *Canter* and its progeny stand for the proposition that at least certain attributes of the "judicial power" may not be freely vested in non-Article III courts. The precise limits on which attributes of that power Congress can properly vest in non-Article III courts is not amenable, however, to a simple answer or statement. Rather, this Court must look at the constitutional genesis of the bankruptcy court under the 1978 Code in determining whether that court is capable of receiving the "judicial power of the United States" of which the contempt power is an attribute.

To begin, the bankruptcy court is clearly not an Article III court, although the House version of the bill would have had it so constituted. *See* H.R. 8200, 95th Cong. 1st Sess. (1977). When and if the Code goes into full effect in 1984, the judges of the bankruptcy court will be appointed by the President subject to Senate confirmation, will serve fourteen-year terms, will receive a salary that is subject to adjustment, including reduction, will be subject to removal from office for conduct less than that amounting to "high crimes and misdemeanors," and will be subject to disciplinary action by federal judges. *See* 28 U.S.C. §§ 152–154. Clearly the salary and tenure provisions of Article III are not met. The Code itself characterizes the bankruptcy court as an "adjunct" to the district court. 28 U.S.C. § 151(a). The Supreme Court in *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.,* —— U.S. ——, 102 S.Ct. 2858, 2867 n. 13, 73 L.Ed.2d 598 (1982), noted this language in the statute and the relevant legislative history, and determined that: "Congress did not constitute the bankruptcy courts as legislative courts."

However it is characterized, as an adjunct to the district court or as a legislative court, this Court finds that the bankruptcy court cannot be vested with the full power of civil contempt that is implicitly authorized in 28 U.S.C. § 1482 and 11 U.S.C. § 105. This conclusion follows from the predicate that a non-Article III court cannot be vested with the broad "judicial power of the United States" of which the contempt power is a non-severable attribute.

There are a number of reasons for this. To allow the contempt power to be vested in a non-Article III court would conflict with the doctrine of separation of powers, disregard the awesome nature of the contempt power itself, subvert its inherently judicial character, and seriously undermine

the fundamental policies which underlie Article III.

Under the Constitution and its scheme for the allocation of power to the three branches of government, the framers recognized the need for the vesting of certain powers in one branch to the exclusion of the others. In Federalist No. 48 Madison wrote:

It is agreed on all sides that the powers properly belonging to one of the departments, ought not to be directly and completely administered by either of the other departments. It is equally evident, that neither of them ought to possess, directly or indirectly, an overruling influence over the others in the administration of their respective powers.

In Federalist No. 47 he also wrote:

[W]here the *whole* power of a department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution are subverted.

That principle was echoed in an early case, *Kilbourn v. Thompson,* 103 U.S. 168, 26 L.Ed. 377 (1881), which addressed the authority of Congress to exercise the contempt power: "it also remains true, as a general rule that the powers confided by the Constitution to one of these departments [branches] cannot be exercised by the other." *Id.* at 191. Although the *Kilbourn* case held that Congress *qua* Congress could exercise the power of contempt (see *infra* ), that limited authority is a far cry from Congress being able at its whim to vest the power in other bodies. This Court sees the contempt power as "inherently judicial," and a power that is part of the uniqueness of the judiciary as a separate branch of government. *See Levine v. United States,* 362 U.S. 610, 616, 80 S.Ct. 1038, 1042, 4 L.Ed.2d 989 (1960) (contempt is "a power 'absolutely essential' for the functioning of an independent judiciary.").

There is also no doubt that Congress can impose limitations on the judicial power of contempt, but the power itself can "neither be abrogated nor rendered practically inoperable." *Ex parte Robinson,* 86 U.S. at 510.

If Congress could vest the contempt power freely in any body it so chose, the judicial nature of the power would clearly be abrogated and the judicial branch of the government would likewise be subverted. The Constitution is clear that if Congress wishes to vest the "judicial power of the United States" it must do so under the terms of Article III. In that way only can the doctrine of separation of powers be preserved.

The trustee disagrees with this proposition and argues that, because the Supreme Court has recognized that the Houses of Congress possess the power to punish for contempt, any tribunal to which they delegate their legislative powers would necessarily inherit the contempt power. This conclusion is without merit. A review of the cases relied upon by the trustee shows that the contempt power of Congress is extremely limited. *Jurney v. MacCracken,* 294 U.S. 125, 147, 55 S.Ct. 375, 378, 79 L.Ed. 802 (1935) ("It is true that the scope of the 'contempt' power is narrow. No act is so punishable unless it is of a nature to obstruct the performance of the duties of the legislature."); *McGrain v. Daugherty,* 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580 (1927) (contempt power of Senate recognized when used to enforce its power of inquiry); *Marshall v. Gordon,* 243 U.S. 521, 546, 37 S.Ct. 448, 455, 61 L.Ed. 881 (1917) (noting a boundary line which "separates the limited implied power to deal with classes of acts as contempts for self-preservation and the comprehensive legislative power to provide by law for punishment for wrongful acts."); *In re Chapman,* 166 U.S. 661, 17 S.Ct. 677, 41 L.Ed. 1154 (1897) (court recognized power of Senate to use contempt to compel testimony before it); *Kilbourn v. Thompson,* 103 U.S. 168, 197, 26 L.Ed. 377 (1881) ("But we do not concede that the Houses of Congress possess this general power of punishing for contempt. The cases in which they can do this are very limited. . . ."); *Anderson v. Dunn,* 19 U.S. (6 Wheat.) 204, 231, 5 L.Ed. 242 (1821) (recognizing the power of Congress in its "self-preservation" capacity to imprison for contempt, but such imprisonment had to terminate with legisla-

tive adjournment). Moreover, the Supreme Court has held that the power of contempt is not an inherent attribute of Congress as a legislative body, but may be exercised by Congress only because the Constitution permits it. *Kilbourn,* 103 U.S. at 189.

From these cases the general principal emerges that Congress has a power of contempt permitted by the Constitution, but that power is limited to special circumstances in which Congress *itself* must effectuate its own preservation as an entity. There is nothing in these cases to suggest that Congress has some inherent power of contempt because it is a legislative body, nor that it can in any way delegate this contempt power. In fact, quite the contrary appears to be the case. Because Congress cannot vest its own limited power of contempt in other bodies of government, to do so it must return to Article III for both the source of the contempt power and the authority to vest it as part and parcel of the judicial power of the United States. And that judicial power can be vested only in an Article III court.

There are sound reasons for reserving the judicial power of contempt to courts constituted under Article III. First and foremost is the awesome nature of the power to imprison or fine summarily. In *Bloom v. Illinois,* 391 U.S. 194, 202, 88 S.Ct. 1477, 1482, 20 L.Ed.2d 522 (1968), the Supreme Court stated:

> The court has long recognized the potential for abuse in exercising the summary power to imprison for contempt—it is an "arbitrary" power which is "liable to abuse." *Ex parte Terry,* 128 U.S. 289, 313, 9 S.Ct. 77, 82, 32 L.Ed. 405 (1888). "[I]ts exercise is a delicate one, and care is needed to avoid arbitrary or oppressive conclusions." *Cooke v. United States,* 267 U.S. 517, 539, 45 S.Ct. 390, 396, 69 L.Ed. 767 (1925).

(Footnote omitted.)

Although the *Bloom* case dealt with the power of criminal contempt, it was the summary nature of the infliction of punishment, no different than that allowed for civil contempts, that concerned the Court.

The fact that the power is so onerous is evidenced by the various statutes enacted by Congress to impose limits on the exercise of that power by the federal courts. Indeed, Congress has limited the exercise of its own powers of contempt by delegating that power in certain instances to the federal courts. *See* 2 U.S.C. § 194. It is not conceivable that such an onerous power could be vested in a body other than a court of law, equity or admiralty.

In addition to the foregoing consideration, the Court believes there are two other fundamental reasons for finding that the contempt power may not be vested in a court which is not endowed with the judicial power under Article III. They are: (1) the recognition by the Supreme Court that "inherently judicial powers" cannot be vested in non-Article III courts, and (2) that the policy reasons behind Article III would be subverted by vesting the contempt power in a non-Article III court.

In deciding whether certain matters can be determined by non-Article III courts, the Supreme Court has relied on the test of whether the matter in question is "inherently judicial." *Glidden Co. v. Zdanok,* 370 U.S. 530, 548–49, 82 S.Ct. 1459, 1471–72, 8 L.Ed.2d 671 (1962); *Ex parte Bakelite Corp.,* 279 U.S. 438, 458, 49 S.Ct. 411, 416, 73 L.Ed. 789 (1929); *Murray's Leasee v. Hoboken Land & Development Co.,* 59 U.S. (18 How.) 272, 280–82, 15 L.Ed. 372 (1856). *See also* Note, *Article III Limits on Article I Courts; The Constitutionality of the Bankruptcy Court and the 1979 Magistrate Act,* 80 Colum.L.Rev. 560, 574–76 (1980) [hereinafter cited as "Note, Article III Limits"]. These cases stand for the proposition that if a matter was traditionally resolved by courts of common law or equity, the matter is inherently judicial. This Court finds the determination and punishment of contempt to be matters traditionally "resolved" by those courts, the limited *constitutional* power of contempt possessed by the legislative branch notwithstanding. The Court in *Kilbourn v. Thompson* found no basis in the law of England for the proposition that the general power of contempt was a tradition-

al power of the legislative branch of government.

We are of opinion that the right of the House of Representatives to punish the citizen for a contempt of its authority or a breach of its privileges can derive no support from the precedents and practices of the two Houses of the English Parliament, nor from the adjudged cases in which the English courts have upheld these practices. Nor, taking what has fallen from the English judges, and especially the later cases on which we have just commented, is much aid given to the doctrine, that this power exists as one necessary to enable either House of Congress to exercise successfully their function of legislation.

*Kilbourn,* 103 U.S. at 189. The *Kilbourn* Court, in recognizing that the contempt power had its origins in the judiciary, held that Congress had a limited power of contempt only because the Constitution permitted it. *See* discussion *supra.*

The nature of the contempt power as "inherent" in the judicial power was well characterized by Frankfurter and Landis in their early and important article on the contempt power:

> The particular aspect of "inherent power" of the inferior Federal courts with which we are dealing concerns their incidental capacity to remove obstructions to the discharge of their work. The conventional description of such obstruction is contempt, and the mode of dealing with it is characterized as the power of courts to punish for contempt. The fact of obstructions to courts is as old as English courts, and so also is the endeavor to remove them. But the ways and means by which this end was sought to be accomplished varied with variations in the nature of the obstruction. Likewise, the manner of removing obstructions was variously exercised by different courts and at different periods.

Frankfurther & Landis, *Power of Congress Over Procedure in Criminal Contempts in "Inferior" Federal Courts—A Study in Separation of Powers,* 37 Harv.L.Rev. 1010, 1023 (1924) (footnote omitted).

Many other decisions have also recognized that the contempt power is inherent in the judicial power of the United States. *See* discussion, *supra,* particularly *In re Nevitt. See also Ex parte Terry,* 128 U.S. 289, 302–04, 9 S.Ct. 77, 78–79, 32 L.Ed. 405 (summarizing the early cases that stated the principle); *In re Chaplain,* 621 F.2d 1272, 1275 (4th Cir.1980) (the contempt power is "[i]nherent in federal judicial power"). It is true that the contempt power is frequently characterized by many of the cases as "inherent" in all courts and, despite Congressional limitations placed upon it, is deemed to be vested in those courts upon their creation. But to find that the contempt power is vested in *all* courts at their inception, including the bankruptcy court under the 1978 Code, is to forget that the contempt power, like all powers of the federal courts, cannot be inherited from thin air, but must flow from the Constitution. The contempt power may be "inherent," but it inheres from the judicial power of the United States and no other source. It can be vested, as part of the judicial power, in only those courts capable of receiving it. The bankruptcy court is not so capable.

There is another, and perhaps more compelling, reason for finding that the contempt power is one not properly vested in the bankruptcy court. To allow that court to exercise this judicial power would seriously undermine the policies upon which Article III is grounded. *See* Note, *Article III Limits, supra,* at 561.

Article III and its tenure and salary provisions were created in the separation of powers scheme to insure the independence and integrity of the federal judiciary, facilitate impartial decision-making, assure proper protection for individual rights, attract the most highly qualified persons to the bench, and insure public confidence in the federal courts. Furthermore, the tenure provisions promote judicial individualism by protecting judges from improper influences, sometimes disguised as discipline, from their colleagues. *See id.* at 583–84 and references therein. The bankruptcy judge,

who at any given time chooses to use or not use the contempt power, is placed in the position of acting or not acting without the protections of the salary and tenure provisions of Article III, and therefore his conduct and the reasons for it may undermine the policies upon which these provisions are founded. The very existence of the bankruptcy court and the judge's job depends on the grace of the Congress. The judge himself is subject to the discipline of other judges. 28 U.S.C. § 153(b). His use of the contempt power can certainly be influenced by that fact alone. The instant case itself illustrates the point. The jailing of Mr. Cryts for contempt brought national publicity and media coverage. He went to Congress on a number of occasions to plead his cause. His case became a political "hot potato." Although Judge Baker has responded directly to the challenge, it cannot be said that bankruptcy judges under these conditions could act with the same security and confidence as could an Article III judge.

But perhaps the most fundamental aspect of Article III is that it guarantees an individual a certain "judicial process": the right to have a controversy resolved or a punishment imposed by an Article III judge. Justice Douglas recognized the right with respect to the qualifications of Article I and Article III judges.

In sum, judges who do not perform Article III functions, who do not enjoy *constitutional* tenure and whose salaries are not *constitutionally* protected against diminution during their term of office cannot be Article III judges.

Judges who perform "judicial" functions on Article I courts do not adjudicate "cases" or "controversies" in the sense of Article III. They are not bound by the requirements of the Seventh Amendment concerning trial by jury.

Judges who sit on Article I courts are chosen for administrative or allied skills, not for their qualifications to sit in cases involving the vast interests of life, liberty, or property for whose protection the Bill of Rights and the other guarantees in the main body of the Constitution, including the ban on bills of attainder and *ex post facto* laws, were designed. Judges who might be confirmed for an Article I court might never pass muster for the onerous and life-or-death duties of Article III judges.

*Glidden v. Zdanok,* 370 U.S. at 606, 82 S.Ct. at 1502 (Douglas, J., dissenting). This is not to say that non-Article III judges are incompetent. Quite the contrary is true. They possess expertise in a well-defined area that in fact most Article III judges do not. But the contempt power involves decisions and considerations regarding fundamental rights of individuals under the law which lies within the expertise of the constitutionally protected Article III judge, not the bankruptcy judge.

Finally, this Court must consider the appealability of civil contempts. Not only is the bankruptcy judge unable to provide that attribute of expertise, which is part of the "judicial process" of Article III, but his decision to fine or imprison would be nonappealable as to a party in the bankruptcy proceeding until a final judgment or decree is entered in the case. In a bankruptcy case, that may take months. *Fox v. Capital Co.,* 299 U.S. 105, 107, 57 S.Ct. 57, 58, 81 L.Ed. 67 (1936) ("The rule is settled in this Court that except in connection with an appeal from a final judgment or decree, a party to a suit may not review upon appeal an order fining or imprisoning him for the commission of a civil contempt"). *Accord Southern Railway Co. v. Lanham,* 403 F.2d 119, 124 (5th Cir.1968) ("Civil contempt is wholly remedial" serves only the purpose of a party litigant, and is intended to coerce compliance with an order of the court or to compensate for losses or damages caused by non-compliance"); *S.E.C. v. Naftalin,* 460 F.2d 471, 475 (8th Cir.1972); *Drummond Co. v. District 20, United Mine Workers of America,* 598 F.2d 381, 383 (5th Cir.1979); *Halderman v. Pennhurst State School & Hospital,* 673 F.2d 628, 636 (3d Cir.1981). The courts have brushed some gloss on this general rule by construing certain contempt orders as final orders. *See Drummond Co.,* 598 F.2d at 383–84 (noting several decisions

doing just that). The general rule, however, is still applicable.

But even assuming that the appellate review mechanism provides a suitable substitute for Article III safeguards, neither the Congress nor the courts can assume away the clear structural dictates imposed by the Constitution. The critical fact is that Congress cannot ignore specific Article III requirements by devising alternative means through which the litigants' due process rights to have their interests decided by tenured Article III judges can be "protected." In short, Congress cannot replace an Article III constitutional safeguard with a statutorily based form of protection accorded only by appellate review. *See* Krattenmaker, *Article III and Judicial Independence: Why the New Bankruptcy Courts Are Unconstitutional*, 70 Ga.L.J. 297, 307 (1981) (mere fact that values sought to be protected by framers can be protected by other mechanisms does not give Congress license to "disregard the framers' specific requirements"). *See also* H.R.Rep. No. 95–595, 39 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6000 ("the limited circumstances in which the courts have permitted departure from the requirements of Article III are not present in the bankruptcy context").

In sum, to allow a bankruptcy judge the unlimited power of civil contempt authorized by the 1978 Code would undermine the very principles upon which Article III is based.

There are a number of loose ends this Court must address before concluding its analysis. The first is the fact that the Supreme Court authorized a very limited power of contempt for bankruptcy referees to impose fines of no more than $250 under Rule 920. Because Judge Baker did not rely on that Rule, and could not, in imposing the fine he did, the issue of the propriety of that Rule and the power of the Supreme Court to confer such extremely limited contempt powers on referees is not before this Court. Therefore, the issue will not be addressed.

The trustee would also have this Court uphold the contempt provisions of the Bankruptcy Code by analogizing them to the contempt powers exercised by the territorial courts and the municipal courts of the District of Columbia. On its face, the analogy appears sound. The argument is as follows: if the basic premise is that the contempt power cannot be severed from the judicial power of the United States and can therefore be vested only in a court created pursuant to Article III, then by what authority has Congress vested the contempt power in the courts of the territories and the District of Columbia?

It is well settled, of course, that the territorial courts are created pursuant to Article IV, section 3 of the Constitution. *See, e.g. American Insurance Co. v. Canter,* 26 U.S. at 546. That provision provides in relevant part:

> "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . .

It has been held that 18 U.S.C. § 401 and Fed.R.Crim.P. 42 apply to contempt proceedings in the District Court of Guam, an implicit recognition of the contempt power of that territorial court. *Phelan v. People of Territory of Guam,* 394 F.2d 293, 297 (9th Cir.1968). Nevertheless, neither that court nor any other court has ever expressly dealt with the question of congressional authority to vest the contempt power in these territorial courts.

What has been addressed, however, is the broader question of constitutional authority. Yet the cases from *Canter* to *Palmore* have done everything but present a clean constitutional rationale for the congressional power to create non-Article III courts. Furthermore, with respect to the territorial courts, serious doubts have been raised whether the concept of a "legislative court" remains viable today considering that the need for an independent Article III judiciary for the territories is certainly as great as it is for the states. As one commentator put it, the territorial judge should have

some feeling of security to try cases impartially without being dependent on the Department of Justice for continued tenure. *See* C. Wright, The Law of Federal Courts, 37 (3d ed. 1976). Nevertheless, a review of the cases does point up a fundamental difference between the power of Congress to establish bankruptcy courts as adjuncts to the district courts for a very limited, specialized subject matter, and the power to establish courts of broad jurisdiction to resolve the myriad of legal issues arising in a territory. The key to that difference is found in the source of power from which Congress legislates for the territories. That power arises out of the authority of Congress to act in the capacity of a local legislative body apart from the usual confines of the Constitution. The seminal cases on the issue make the point clear.

Chief Justice Marshall in the *Canter* case identified the source of power from which the Congress could create the territorial courts and vest them with judicial power.

The jurisdiction with which they are invested, is not a part of that judicial power which is defined in the 3d article of the constitution, but is conferred by congress, in the execution of those general powers which that body possesses over the territories of the United States.... In legislating for them, congress exercises the combined powers of the general, *and of a state government.*

26 U.S. at 321 (emphasis added). In *Benner v. Porter,* 50 U.S. (9 How.) 235, 242, 13 L.Ed. 119 (1850), the Supreme Court made it even clearer that the territories and their courts were not subject even to the Constitution and its mandates absent a Congressional statement to the contrary.

The distinction between the Federal and State jurisdictions, under the Constitution of the United States, has no foundation in these Territorial governments; and consequently, no such distinction exists, either in respect to the jurisdiction of their courts or the subjects submitted to their cognizance. They are legislative governments, and their courts legislative courts, Congress, in the exercise of its

powers in the organization and government of the Territories, combining the powers of both the Federal and State authorities. There is but one system of government, or of laws operating within their limits, as neither is subject to the constitutional provisions in respect to State and Federal jurisdiction.

They are not organized under the Constitution, nor subject to its complex distribution of the powers of government, as the organic law; but are the creations, exclusively, of the legislative department, and subject to its supervision and control.

*Id.* at 242 (emphasis added). *But see McAllister v. United States,* 141 U.S. 174, 11 S.Ct. 949, 35 L.Ed. 693 (1891) (indicating certain fundamental individual rights found in the Constitution might apply to the territories by inference). The plurality in the recent *Marathon* decision recognized that, in dealing with the territories and the District of Columbia, Congress is vested with "a complete power of government." 102 S.Ct. at 286.

The situation in the District of Columbia is identical to that in the territories. Although the District Court and the Court of Appeals for the District of Columbia are now Article III courts, the Superior Court for the District of Columbia and the District of Columbia Court of Appeals are Article I courts. D.C.Code Ann. § 11–101. Congress has vested both the municipal courts with powers of contempt equal to those of the federal courts. D.C.Code Ann. 11–944, 11–741. But with respect to the District of Columbia, the Supreme Court long ago recognized that Congress legislates there in its capacity as a local legislature as well as a general one. In *Kendall v. United States,* 37 U.S. (12 Pet.) 522, 618, 9 L.Ed. 1181 (1838), the Court reviewed the congressional creation of non-Article III courts in the District and held that in the District of Columbia there was

no division of powers between the general and state governments. Congress has the entire control over the district for every purpose of government; and it is reasonable to suppose, that in organizing

a judicial department here, all judicial power necessary for the purposes of government would be vested in the courts of justice.

More recently, the Supreme Court reaffirmed this view in *Palmore*. *See* 411 U.S. at 403, 93 S.Ct. at 1679. Thus, as with the territories, Congress acts as the local legislative body for the District of Columbia, although it has established local governments in both the District and territories as well.

In sum, the Congress vests the power of contempt in the territorial courts and municipal courts of the District of Columbia by virtue of its authority as the "complete government" for those areas. Although its initial grant of authority to deal with the territories and the District of Columbia comes from the Constitution, the Constitution does not thereafter bind Congress when it puts on the hat of a local legislative body and parcels out various functions to branches of the local government it creates. The courts created for the territories and the District of Columbia, then, lie entirely outside the states of the federal union, unlike the bankruptcy courts. *See Marathon*, 102 S.Ct. at 2871 ("The courts created by the Bankruptcy Act of 1978 do not lie exclusively outside the States of the Federal Union, like those in the District of Columbia and the territories"). It might even be said that the power conferred upon the territorial and the District of Columbia municipal courts is the "judicial power of the territory" rather than the "judicial power of the United States." The contempt power exercised by these courts is clearly an attribute of the territorial judicial power that Congress has the exclusive right to vest, in whatever form it chooses, because that judicial power does not arise from Article III, but from the power of Congress to act as a local legislature to establish a complete system of government for these areas. Congress has no such broad power with respect to the bankruptcy courts. They are a federal subject matter and a very narrow and specialized one at that. To vest them with the contempt power requires the constitutional authority of Article III, which

those courts do not have as their foundation for existence.

The trustee points out that Congress has authorized the Tax Court, an Article I court, to fine or imprison for contempt under the exact circumstances as the district and appellate courts may. *See* 26 U.S.C. § 7456(d). The constitutionality of that provision is not before this Court. Nevertheless, this Court notes that prior to the enactment of that provision in 1969, it was held that the Tax Court did not have any inherent power of contempt. *MacRae v. Riddle*, 350 F.2d 291, 292 (9th Cir.1965). The constitutionality of 26 U.S.C. § 7456(d) has never been directly raised. Apparently, only two courts have ever made mention of it, both in dicta. *Continental Equities, Inc. v. Commissioner of Internal Revenue*, 551 F.2d 74, 83 (5th Cir.1977); *Ryan v. Commissioner of Internal Revenue*, 517 F.2d 13, 19 (7th Cir.), *cert. denied*, 423 U.S. 892, 96 S.Ct. 190, 46 L.Ed.2d 124 (1975). Therefore, this Court finds the precedential value of these cases unpersuasive. At the very least, the constitutionality of the contempt power of the Tax Court appears to be in serious doubt.

This Court does note, however, that if the bankruptcy court is an adjunct to the federal district court, there is precedent for limiting its power of contempt to certifying the facts of contemptuous conduct to the district court judge, who may then enter the appropriate order. Such is required of federal magistrates, they having no power of contempt themselves. 28 U.S.C. 636(e). The Court also notes that in the Court of Claims structure, the "court"—which is an Article III court—functions as an "appellate court," the judges of which have the contempt power, while designated "trial judges" do the actual fact finding and initial decision-making. *See* U.S.Ct.Cl.Rule 8, 28 U.S.C.A. Those "trial judges" do not have contempt powers but must certify facts to the "appellate court" (i.e. Article III judges) for appropriate contempt orders to issue. *See* U.S.Ct.Cl.Rule 13(e), 28 U.S.C.A. Certainly the relationship between the bankruptcy court and the district court is not altogether different from this.

This Court also notes that the Congress itself was concerned with the constitutional problems of vesting the contempt power in the bankruptcy court under the 1978 Code. The Senate version of the Code would have limited the power to maximum fines of $1,000 with no power to imprison. *See* S.Rep. No. 95–989, 95th Cong., 2nd Sess. p. 148 (1978). The House was concerned that the power could not be vested in the bankruptcy court unless it was constituted as an Article III court. *See* H.Rep. No. 95–595, 95th Cong., 1st Sess. p. 38 (1977). Chairman Rodino of the House Committee on the Judiciary even went so far as to draft a letter which was sent to a number of constitutional scholars. Part of that letter, which addressed the constitutionality of the proposed bankruptcy code as a whole, specifically dealt with the contempt power. *Id.* at 64. The letters in response which mentioned the contempt power problem indicated clear concern as to whether the criminal contempt power could be conferred on the new court, while some letters indicated that vesting of civil contempt powers would also be unwise. *See id.* at 78 (Prof. Mishkin), 81 (Prof. Sandalow), 84 (Prof. Shapario), 86 (Prof. Wechsler), and 87 (Prof. Wright).

Finally, this Court must address appellant's theory that as a result of the Supreme Court decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* —— U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the contempt provisions of the 1978 Code are unconstitutional. Although the *Marathon* decision is not controlling in this case because of its prospective application (see *infra*), the analysis and conclusions made by the Court are instructive in resolving the contempt power issue. In *Marathon* the plaintiff had filed a bankruptcy petition in the United States Bankruptcy Court for the District of Minnesota. Shortly thereafter, it filed in that same court a suit against the defendant seeking damages for alleged breaches of contract and warranty, claiming the suit was related to the bankruptcy proceeding. Defendant contested the jurisdiction of the bankruptcy court to hear the contract and warranty claims. A four-Justice plurality found the statute granting jurisdiction to the bankruptcy courts, 28 U.S.C. § 1471, to be an unconstitutional delegation of Article III power to a non-Article III court. Title 28 U.S.C. § 1471 states in relevant part:

(a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 or related to cases under title 11.

(c) The bankruptcy court for the district in which a case under title 11 is commenced shall exercise all of the jurisdiction conferred by this section on the district courts.

Two Justices concurred with the judgment, but only to the extent that the particular claim at issue was one not adjudicable by a bankruptcy court. But because the impermissible grant of authority was not severable from the remaining grant of authority to the bankruptcy courts, the concurrers agreed with the plurality in finding the entire jurisdictional statute unconstitutional. 102 S.Ct. at 2880–82.

The plurality opinion would appear to be limited by Justice Rehnquist's concurrence. He found that the impermissible aspect of the statute was the broad grant of jurisdiction accorded the bankruptcy courts which allows them to hear suits that "are the stuff of the traditional actions at common law" or "arise entirely under state law." *Id.* at 2881. The civil contempt power would not appear to fall precisely within either of those classifications. Nevertheless, this Court believes that *Marathon* stands for the more fundamental proposition that *any* proceeding "arising in or related to" bankruptcy matters, which proceeding traditionally had to be resolved through the exercise of the judicial power of the United States, cannot be resolved by a court of bankruptcy. The power to sanc-

tion for civil contempt is clearly such a proceeding, and usually a summary one at that.

The plurality opinion in *Marathon,* though it spoke in terms of jurisdictional grants to the bankruptcy court, was clearly describing impermissible grants of judicial power, that is, the jurisdiction to exercise certain judicial powers.

> [T]he bankruptcy courts exercise all ordinary powers of district courts, including the power to preside over jury trials, 28 U.S.C. § 1480 (1976 ed., Supp. III), the power to issue declaratory judgments, § 2201, the power to issue writs of habeas corpus, § 2256, and the power to issue any order, process or judgment appropriate for the enforcement of the provisions of title 11, 11 U.S.C. § 105(a) (1976 ed., Supp. III), [footnoting 28 U.S.C. § 1481.]

*Marathon,* 102 S.Ct. at 2879. To the plurality, these grants of power, along with others previously addressed, were unconstitutional.

> We conclude that § 241(a) of the Bankruptcy Act of 1978 has impermissibly removed most, if not all, of "the essential attributes of the judicial power" from the Art. III district court, and has vested those attributes in a non-Art. III adjunct. Such a grant of jurisdiction cannot be sustained as an exercise of Congress' power to create adjuncts to Art. III courts.

*Id.* at 2879–80.

It is noteworthy that the *Marathon* court viewed the contempt power as an "essential attribute of the judicial power." This Court believes that, had the issue been before it, the Supreme Court would have found the broad grant of contempt power under the 1978 Code to be unconstitutional.

■ In the final analysis, this Court concludes the contempt powers of the bankruptcy judge, implied under 28 U.S.C. § 1481 and 11 U.S.C. § 105, constitute an unconstitutional grant of judicial power. In this case, under the findings of the bankruptcy judge, there is no doubt that the soybeans taken by Wayne Cryts were the property of the trustee and that the taking

was wrongful. Nevertheless, Judge Baker did not have the authority to punish Mr. Cryts for contempt as he did. The grant of that power by the Congress was unconstitutional.

To summarize, the contempt power is an attribute of the judicial power of Article III and cannot be vested in a non-Article III court because the "judicial power of the United States" cannot be vested in such a court. Those cases which referred to the inherent power of contempt in a bankruptcy court in fact referred to the power of the *district court* constituted as the bankruptcy court and as the repository of bankruptcy jurisdiction. The broad power to punish for contempt is "inherently judicial" and therefore not delegable by Congress to a non-Article III court. Allowing the bankruptcy court to exercise this fundamental Article III power would undermine the very premises underlying that Article of our Constitution. Broad contempt powers are an exclusive Article III prerogative. Their exercise has a fundamental impact on the rights of citizens. They are often exercised in a summary fashion with minimal due process and procedural protections. Such power is constitutionally vested in Article III courts. It cannot be vested by legislative fiat in non-Article III courts.

Finally, the bankruptcy court is not without means to enforce its orders or insure its dignity. It can certify facts of contemptuous conduct to the district court for a prompt and appropriate order. Given the awesome power of contempt, this is "the least possible power adequate to the end proposed" as required by *Anderson v. Dunn,* 19 U.S. at 230.

*Constitutionality of the Code.*

As his final argument, appellant contends that, in light of *Marathon,* the bankruptcy court lacked jurisdiction over the entire matter. Without analyzing the ramifications of the decision and the effect of the stay the Supreme Court imposed on its judgment, this Court simply refers appellant to section V of the opinion, which states that: "our decision today shall apply

only prospectively." *Marathon,* 102 S.Ct. at 2880.

*The Remedy.*

This Court has found unconstitutional the broad power to sanction for contempt granted to the bankruptcy court under 11 U.S.C. § 105(a) and 28 U.S.C. § 1481. This holding, however, does not dispose of the issue of the appellants' alleged contemptuous conduct in the removal of approximately 31,000 bushels of soybeans from the MFA elevator at Bernie, Missouri, on July 22, 1981. This removal was made in disobedience of the April 27, 1981, order of the Eighth Circuit Court of Appeals which gave the trustee jurisdiction over the "Missouri grain," which included the soybeans at Bernie. *See State of Missouri,* 647 F.2d at 778.

Although Judge Baker lacked authority to impose the contempt sanctions which he did, it does not follow that this Court is without authority to find the appellants in contempt. Had Judge Baker known he lacked the authority to find the appellants in contempt, he had an alternative course of action available. That alternative was to certify the facts of the contempt to this Court pursuant to Rule 920(a)(4) of the Bankruptcy Code. Judge Baker did follow that procedure, however, with respect to his certification to this Court of appellants' alleged criminal contempt. And because his finding of civil contempt was predicated on the identical facts he certified for the criminal contempt, this Court will treat Judge Baker's certification of facts as a certification for both criminal and civil contempts. The facts certified can be found in Judge Baker's Memorandum Opinion of June 7, 1982. The pertinent portions are as follows:

> None of the defendants except Wayne Cryts have testified. They have made no attempt to rebut clear and convincing evidence that they were knowledgeable participants in the activities at Bernie on July 22. Obviously Wayne Cryts was the leader of the pack, and therefore, there is greater evidence about his conduct. Nevertheless, there is ample evidence that the other defendants did participate in the theft, and their refusal to testify or present any mitigating evidence amounts to an admission. Consequently, they also will be certified to the District Court for criminal contempt proceedings.

> Wayne Cryts has asserted that the soybeans he took from Ristine and later from Bernie were his. They were not, for several reasons. First of all, Cryts' soybeans were not segregated or separately identifiable in any way. They were commingled with all of the soybeans of the other farmers/depositors, some of whom sold their soybeans and some of whom stored their soybeans. . . .

> Secondly, Wayne Cryts did not have evidence of legal title to the soybeans. When Mr. Cryts deposited his soybeans into debtors' elevator at Ristine, he received a negotiable warehouse receipt. He endorsed that warehouse receipt to the C.C.C. when he borrowed money from them. There has never been a time when Wayne Cryts had warehouse receipts to present to the Trustee. He has never paid off his loan. He has defaulted on his loan, and all of his rights have been forfeited to the C.C.C. It is interesting to note in passing that it is a crime in both Missouri and Arkansas to dispose of mortgaged property without paying off the lender. Wayne Cryts received about $140,000.00 for his soybeans from the taxpayers via the C.C.C. in the fall of 1979. Now he has stolen $218,019.92 worth of soybeans from Trustee and, indirectly, his neighbors. Mr. Cryts' assertion of the nobility of his cause becomes suspect when it is realized that he is trying to justify a double recovery. His profit from this escapade is at least $140,000.00.

> Finally, there is the problem of the shortage of grain. There were not enough soybeans in the elevator to make a full return to all of the farmers who had warehouse receipts. In addition, there were other creditors who had liens on the grain stored in the elevator. The other farmers and creditors know that when Mr. Cryts took "his" soybeans, he was really taking "their" soybeans.

The Court is convinced that Mr. Cryts is a smart man. He knew all of these facts and chose to ignore them. Mr. Cryts justified his actions by saying that the C.C.C. had called his loan. The C.C.C. gave Mr. Cryts a ten (10) month extension on his loan before it was called. There is no evidence in the record that he made any attempt to refinance his loan with the C.C.C. or any other lender. He has sold his beans and kept them too. Even if you can consider that there is something "wrong" with the C.C.C. calling the loan, that does not justify stealing property that is in the rightful possession of Trustee. Two "wrongs" have never made a "right"!

\* \* \* \* \* \*

It is the Court's opinion that Wayne Cryts is a thief. He took property that three courts had declared belonged to Trustee....

This Court has watched Wayne Cryts testify on many occasions. He is not an ignorant man. Indeed, his calm demeanor, while readily admitting open defiance of the law, is indicative of his intelligence and rationality. He knows what he is doing. His actions were not done in a fit of pique or the heat of passion. He cooly calculated a course of open defiance of the entire legal system. He has openly bragged about his defiance. He has stolen from the Court and his neighbors. He ought to be punished for his criminal acts.

Pending before this Court then is a certification for both criminal and civil contempt. The civil contempt is brought to compensate the trustee for his injury and costs incurred as a result of the appellants' removal of the soybeans from the grain elevator at Bernie and to coerce compliance with the Court's orders. The criminal contempt is brought to punish the appellants for that same conduct because it was done in willful disobedience of a lawful court order. This Court will, therefore, conduct a show cause hearing to determine if the appellants should be found in civil and/or criminal contempt.

■ It is clear that under certain circumstances civil and criminal contempts can be tried together in the same proceeding. The Supreme Court so stated in *United States v. United Mine Workers of America,* 330 U.S. 258, 298–300, 67 S.Ct. 677, 698–99, 91 L.Ed. 884 (1947):

If the defendants were thus accorded all the rights and privileges owing to defendants in criminal contempt cases, they are put in no better position to complain because their trial included a proceeding in civil contempt and was carried on in the main equity suit. Common sense would recognize that conduct can amount to both civil and criminal contempt. The same acts may justify a court in resorting to coercive and to punitive measures. Disposing of both aspects of the contempt in a single proceeding would seem at least a convenient practice.... Even if it be the better practice to try criminal contempt alone and so avoid obscuring the defendant's privileges in any manner, a mingling of civil and criminal contempt proceedings must nevertheless be shown to result in substantial prejudice before a reversal will be required. (Footnotes omitted.)

*Accord Philippe v. Window Glass Cutters League of America,* 99 F.Supp. 369, 374 (W.D.Ark.1951).

With respect to procedural requirements, Federal Bankruptcy Rule 920(a)(4) states that: "On such certification the [district court] judge shall proceed as for a contempt not committed in his presence." For a criminal contempt, that would require compliance with Fed.R.Crim.P. 42(a). For a civil contempt, the due process protections required appear to be the same. *See Philippe,* 99 F.Supp. at 375 ("[T]he basic requirements of due process, notice and hearing, should be followed"); *Fisher v. Marubeni Cotton Corp.,* 526 F.2d 1338, 1342 (8th Cir.1975) (For civil contempt "the basic requirements of due process—adequate notice and proper hearing—were still required").

■ In proceedings conducted pursuant to a certification for contempt from the

bankruptcy judge, the proper procedure is to issue a show cause order requiring the accused contemnor to appear before the district court judge. *See, e.g., Beebe v. Auslander,* 629 F.2d 985 (4th Cir.1980) (appellate court upheld district court which, upon receiving a certification of facts for both civil and criminal contempt from the bankruptcy judge, issued a show cause order, held a hearing and found the debtor guilty of both civil and criminal contempt). Judge Baker has already conducted a show cause hearing. Appellants' due process rights are not violated by having a second show cause hearing before this Court. *Fidelity Mortgage Investors v. Camelia Builders, Inc.,* 550 F.2d 47, 56 (2d Cir.1976).

Finally, this Court notes that the case law is not clear on the issue of how to treat Judge Baker's findings of fact for purposes of its own show cause hearing. For the civil contempt aspect of the hearing, it would appear that Judge Baker's findings must be accepted by this Court unless "clearly erroneous." *See* Federal Bankruptcy Rules 752(a) and 810. *See also Fidelity Mortgage Investors,* 550 F.2d at 52 (clearly erroneous standard applies to facts certified for civil contempt). However, an early case, *O'Hagan v. Blythe,* 354 F.2d 83 (2d Cir.1965), which was decided before the adoption of the 1973 Bankruptcy Rules, held that a *de novo* review of the certified facts was required of the district court judge, although that case involved only a criminal contempt certification, i.e., not *both* civil and criminal citations.

The Trustee and the accused contemnors will be given an opportunity to address all unresolved questions relating to the procedures to be followed, and the appropriate factual issues to be resolved, in disposing of both the civil and criminal contempt matters in the light of the decisions reached above. A letter accompanying copies of the Memorandum Opinion will direct the parties' attention to certain matters and establish a short briefing schedule.

It is therefore Ordered that the judgment of the bankruptcy court holding the appellants in civil contempt be, and it is hereby, vacated.

An appropriate order will be entered directing the appellants to appear before the Court and show cause why they should not be held in civil and criminal contempt for the removal of approximately 31,000 bushels of soybeans from the MFA grain elevator in Bernie, Missouri, on July 22, 1981.